Filed 12/4/13

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

THE PEOPLE,

    Plaintiff and Respondent,

v.

BENJAMIN JAMES BOATMAN,

    Defendant and Appellant.

E054852

(Super.Ct.No. RIF10001458)

O P I N I O N

APPEAL from the Superior Court of Riverside County. Elisabeth Sichel, Judge. Affirmed with directions.

Tracy A. Rogers, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Peter Quon, Jr. and Anthony Da Silva, Deputy Attorneys General, for Plaintiff and Respondent.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part III B. through H.

## I. INTRODUCTION

Defendant and appellant, Benjamin James Boatman, shot his girlfriend, Rebecca Marth, in the face, killing her. Defendant said the shooting was an accident. At trial, he argued that although he was criminally negligent, he did not commit murder. A jury convicted him of first degree murder (Pen. Code, § 187 subd. (a))[1] and possession of marijuana for sale (Health and Saf. Code, § 11359). The jury also found true two enhancement allegations that defendant personally and intentionally discharged a firearm that caused great bodily injury or death (Pen. Code, § 12022.53, subd. (d)) and the offenses were committed while defendant was released from custody pending trial on another felony offense (Pen. Code, § 12022.1).

Defendant was sentenced to an indeterminate term of 25 years to life on the murder conviction plus an additional 25 years to life for the firearm enhancement. In addition, the court sentenced defendant to a determinate term of three years on the possession of marijuana conviction to be served concurrent to the indeterminate sentence. The court imposed, and did not stay, a two-year consecutive term for the on-bail enhancement.

In the published portion of our opinion, we address defendant's contention that the evidence is insufficient to support the conviction for first degree murder. Because we conclude that there is substantial evidence that defendant committed murder, but

_____

[1] All further statutory references are to the Penal Code unless otherwise indicated.

insufficient evidence to support the first degree murder elements of premeditation and deliberation, we will reduce the murder conviction to second degree murder. We will address other contentions in the unpublished portion of the opinion.

## II. SUMMARY OF FACTS

At approximately 3:30 a.m. on March 18, 2010, defendant was released from jail on bail. He walked home, where he lived with his father (Jim), a sister (Hanna), an older brother (Brandon), and a younger brother (Brenton).[2] Brandon's girlfriend, Victoria Williams, was also staying there at that time.

After talking with Brenton for awhile, defendant and Brenton drove to Marth's house, picked her up, and returned home. Defendant had been dating Marth for about one year and, he testified, was in love with her. However, defendant also had an ex-fiancée and was conflicted about whom he wanted to be with.

Around 7:05 a.m., Officer Eric Hibbard responded to a report of a shooting at defendant's house. When he arrived, he saw Brenton leaning up against the fender of a white Cadillac holding Marth in his arms. Marth had been shot in the face. Shortly after Officer Hibbard placed Marth on the ground, defendant came running out of the house with blood on his clothes and face. Defendant told Officer Gregory Hayden to "[c]all the ambulance for my girlfriend."

---

[2] To avoid confusion and meaning no disrespect, we will refer to the Boatmans by their first names.

3

With both defendant and Brenton detained, Officer Hibbard and two other officers conducted a safety sweep of the house. Inside, the officers found Brandon, Williams, and Hanna. Upon entering the bedroom where Marth had been shot, Officer Hibbard saw bloodstains on the bed and pillow. He also saw some marijuana and marijuana paraphernalia in the room. A trail of blood led Officer Hibbard from the bedroom to the kitchen. Officer Hibbard saw a black revolver on the kitchen floor. Both the floor and revolver appeared to be wet with water. The revolver contained five live .38-caliber rounds, as well as one fired round. During a subsequent search of the room where Marth was shot, a box containing a semiautomatic handgun, a box of .38-caliber bullets, and a duffel bag containing a sawed-off shotgun and a box of shotgun shells were found.

Brandon's bedroom shares a wall with the room in which Marth was shot. On the day of the shooting, Williams (who was in Brandon's room) told an investigating officer that she was awoken by a "[l]oud screaming argument between a guy and a girl for at least three minutes." She said she did not know where the yelling was coming from and that she could not tell what the "[l]oud screaming" was about. At trial, Williams did not remember characterizing the sounds she heard as "loud screaming," and said she was awoken by "loud talking." A couple of minutes after hearing the "loud talking," Williams heard a gunshot. Immediately afterward, Williams heard a commotion and screaming; "it seemed like someone was panicking, like yelling or screaming like out of fear."

4

Defendant was taken to the police station by a Riverside police officer. On the way to the police station, defendant asked the officer if he knew if Marth was okay. Defendant said: "I can't lose her. I would do anything for her. How is someone supposed to go on with their life when they see something like that? We were just going to watch a movie." Defendant was crying with his head down for most of the trip.

Defendant was interviewed by two homicide detectives. He gave different versions of what had happened that day and admitted at trial that he lied to the officers. In the first version, defendant claimed that Marth had accidentally shot herself. He said he was showing her a gun he had recently purchased; he did not tell her it was loaded; and as she was playing around with it, she accidentally shot herself.

In defendant's second version, he said he shot Marth, but claimed the shooting was accidental and that he did not think the gun was loaded. He explained that they were sitting on the couch; Marth pointed the gun at him, he pushed the gun away, and she pointed it at him again; he then took the gun, pointed it at her, and accidentally shot her.

In the third version, defendant said he knew the gun was loaded. He described the events this way: "She pointed it at me. I slapped it away. She pointed it at me. I slapped it away. We both knew it was loaded. And then I went like that and I cocked back the hammer just jokingly and it slipped, pow." He later added: "I pulled it back . . . . [¶] . . . [¶] . . . and it slipped. [¶] . . . [¶] . . . Like I didn't get to pull it all the way back." In this version, defendant claimed that his finger was not on the trigger. At

5

trial, this version was placed in doubt by a criminalist with an expertise in firearms who testified that, because of the multiple safeties on the gun, the gun could not be fired by pulling the hammer back and releasing it before it is fully cocked.

Defendant testified at trial. He stated that after a few restless nights in jail, he was released on bail around 3:30 a.m. and walked home. Along the way, he sent a text message to Marth to tell her he was going to come get her. He arrived at his house around 5:00 a.m. He and Brenton picked up Marth around 5:30 that morning and returned to their house. Defendant and Marth were happy to see each other.

After the three returned to defendant's house, they planned to smoke a "blunt"—a cigarillo in which the tobacco has been removed and replaced with marijuana—and watch a movie. After showering, defendant took some Xanax and Norcos pills. Defendant said that these pills typically make him feel drunk and euphoric and that on the day in question the drugs made him disoriented.[3]

Defendant and Marth were in a bedroom that had been converted from a back patio. Defendant went to his safe, which contained marijuana and money, and began weighing the marijuana and counting the money. Marth said, "[h]ey, baby." Defendant turned around and saw Marth pointing a gun at him. Marth had apparently retrieved the gun from underneath defendant's pillow. Defendant was not worried because he trusted Marth. He slapped the gun away and continued to weigh the marijuana.

---

[3] The detective who interviewed defendant testified that he did not notice that defendant had any symptoms of being under the influence of drugs during their interview.

At this point, a mosquito landed on Marth, causing her to "scream[] a little bit." She "jumped up, started waving her hands, doing a whole bunch of girly stuff . . . ." In order to tease her, defendant "grabbed the mosquito, and . . . brought it closer to her, and she got even more upset." To make up for the teasing, defendant gave Marth a hug and a kiss, then went back to weighing his marijuana.

When defendant turned around, Marth was sitting on the edge of the bed pointing the gun at him again. The bed did not have a frame and was low on the floor. Defendant, who had just finished putting the marijuana back into the safe on the floor, was squatting and about "eye to eye" with Marth. He took the gun away from Marth and pointed it at her. He knew the gun was loaded when he received it and it "had to be loaded because [he] didn't take the bullets out." He cocked the hammer back, but did not intend to threaten or shoot her. He was "[j]ust kind of being stupid[.]" Defendant then described what happened next:

"[DEFENDANT:] She slapped the gun, and as soon as she slapped the gun, the gun went off. I almost dropped it. I tried to grab hold of it. Still the gun didn't drop. As soon as I squeezed it, it went off.

"Q. Okay. Why are you squeezing it?

"A. I didn't want to drop it. I didn't want anything to happen. I guess just a reaction.

"Q. Okay.

7

"A. You drop something; you try not to drop it.

"Q. Did you sit there and think this through step by step or was it kind of more an instinctive reaction?

"A. It just happened so quick. It just happened. I didn't think about it at all."

Immediately after the shot, defendant told Brenton "to call the cops," which he did. Defendant tried to give Marth mouth-to-mouth resuscitation. When Marth told defendant she could not breathe, defendant and Brenton took her outside to the driveway in front of the house "to get her help."

Defendant went back into the house to get his keys. From inside the house, he heard sirens and panicked. Defendant grabbed the gun and rinsed it off in an attempt to wash off the fingerprints. He tossed the gun into the bottom of a kitchen cabinet. He then ran outside where he was met by police officers.

A recording of Brenton's 911 call was played to the jury. Brenton lied to the 911 operator, telling her his name was "Paul" and that he did not know who had shot Marth. Defendant can be heard in the background of the telephone call crying and repeatedly saying things like, "[n]oooo," "[b]aby," and "[b]aby are you alive, baby . . . ."

A forensic pathologist estimated that the gun was fired roughly 12 inches from Marth's face. She arrived at this estimate based on evidence of stippling, "a phenomenon where some of the gunpowder comes out of the gun and actually tattoos and burns the skin." The doctor also opined on the trajectory of the bullet: "Essentially the projectile

8

entered just to the left side of her nose. It was recovered in the back portion of her neck a little bit to the right. And so the trajectory would have been front to back, slightly left to right, and slightly downward."

Marth's best friend, Heather Hughes, testified that she and Marth had exchanged text messages in the hours before the shooting. A text sent at 10:29 p.m. on March 17, 2010 (the night before defendant was released from jail) read: "Going to sleep soi [*sic*] can wake up when [defendant] calls." At 4:24 a.m. on March 18, 2010, Marth texted: "[Defendant']s out." Two minutes later she sent: "I alrea[d]y fuckin wish he was locked back up.....[O]mg [you] have no clue." At 7:02 a.m., Marth wrote: "Just were [*sic*] fighting ...with him right now."

## III. DISCUSSION

### A. *Sufficiency of the Evidence of First Degree Murder*

Defendant contends the evidence was insufficient to find him guilty of first degree murder. We agree. Although the evidence is sufficient for reasonable jurors to have found that defendant killed Marth with malice aforethought, there is insufficient evidence to support the finding that the killing occurred with premeditation and deliberation.

#### 1. Standard of Review

A state court conviction that is not supported by sufficient evidence violates the due process guarantees of the federal and California Constitutions, and is therefore invalid. (*People v. Rowland* (1992) 4 Cal.4th 238, 269.) In determining whether a

9

criminal conviction is supported by sufficient evidence for purposes of federal due process, a reviewing court must "determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 318, fn. omitted.)  In *Jackson*, the Supreme Court explained that "this inquiry does not require a court to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'  [Citation.]  Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  [Citation.]  This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." (*Id.* at pp. 318-319, fn. omitted.)

The standard under our state Constitution is "identical." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 87.)  As our state Supreme Court has explained, we "must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty

10

beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) Substantial evidence is evidence that "maintains its credibility and inspires confidence that the ultimate fact it addresses has been justly determined." (*People v. Conner* (1983) 34 Cal.3d 141, 149.) The "whole record" includes "the entire picture of the defendant put before the jury" and is not limited "to isolated bits of evidence selected by the respondent." (*Id.* at p. 577.) This standard is the same regardless of whether the People primarily rely on circumstantial evidence. (*People v. Bean* (1988) 46 Cal.3d 919, 932.)

2. Background Principles

Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) Malice may be either express or implied. Express malice exists when there is a deliberate intention unlawfully to take away the life of a fellow creature. (§ 188.) It is implied when no considerable provocation appears or when the circumstances attending the killing show an abandoned and malignant heart. (§ 188.) This statutory definition of implied malice "is quite vague" and "'has never proved of much assistance in defining the concept in concrete terms.' [Citation.]" (*People v. Chun* (2009) 45 Cal.4th 1172, 1181.) Courts have interpreted the statutory language to mean that malice is implied "when a killing results from an intentional act, the natural consequences of which are dangerous to human life, and the act is deliberately performed with knowledge of the danger to, and with conscious disregard for, human life." (*People v. Cook* (2006) 39 Cal.4th 566, 596.)

11

Here, defendant concedes that the evidence, viewed favorably to the prosecution, is sufficient to support a jury's finding of implied malice. We agree. Defendant told interviewing officers he knew the gun was loaded and intentionally cocked the hammer back, albeit "jokingly"; the hammer slipped, causing the gun to fire and kill Marth. The jury could have easily concluded that pointing a loaded gun at someone and pulling the hammer back is an intentional act, the natural consequences of which are dangerous to human life, and that defendant deliberately did so with knowledge of such danger and with conscious disregard for Marth's life, even if, as defendant said, "it was just all in play." There is thus sufficient evidence to establish that defendant acted with malice aforethought and committed murder.

There are two degrees of murder. Section 189 defines first degree murder as "murder which is perpetrated by means of a destructive device or explosive, a weapon of mass destruction, knowing use of ammunition designed primarily to penetrate metal or armor, poison, lying in wait, torture, or by any other kind of willful, deliberate, and premeditated killing, or which is committed in the perpetration of, or attempt to perpetrate, arson, rape, carjacking, robbery, burglary, mayhem, kidnapping, train wrecking, or any act punishable under Section 206, 286, 288, 288a, or 289, or any murder which is perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict death, is murder of the first degree. All other kinds of murders are of the second degree."

12

In *People v. Thomas* (1945) 25 Cal.2d 880, our state Supreme Court construed the meaning of "willful, deliberate, and premeditated" in light of the phrase's placement among the specifically enumerated instances of a killing perpetrated, among other ways, during arson, rape, robbery, burglary, or mayhem. (*Id.* at p. 899.) Applying the *ejusdem generis* rule of statutory construction, the court stated: "By conjoining the words 'willful, deliberate, and premeditated,' in its definition and limitation of the character of killings falling within murder of the first degree the Legislature apparently emphasized its intention to require as an element of such crime *substantially more reflection* than may be involved in the mere formation of a specific intent to kill." (*Id.* at p. 900, italics added.)

In *People v. Bender* (1945) 27 Cal.2d 164, the Supreme Court explained the need to distinguish deliberation and premeditation from malice aforethought. Malice aforethought is "an essential element of the crime of murder whether it be of the first degree or of the *second* degree . . . . [¶] . . . [¶] . . . [and] is not synonymous with the elements of deliberation and premeditation . . . ." (*Id.* at p. 180.) "Obviously, if malice aforethought necessarily included or presupposed a deliberate and premeditated intent[,] then all murder would be of the first degree because any homicide, to constitute murder at all, must be an unlawful killing with malice aforethought; and the Legislature would be guilty of an utterly meaningless classification of murder into two degrees, with no field in which the second could operate. Likewise it is obvious that the mere intent to kill is not the equivalent of a deliberate and premeditated intent to kill." (*Id.* at p. 181.)

Deliberation, the *Bender* court stated, "'means careful consideration and examination of the reasons for and against a choice or measure.' [Citation.]" (*People v. Bender, supra,* 27 Cal.2d at p. 183.) Premeditation "means 'To think on, and revolve in the mind, beforehand; to contrive and design previously.' [Citation.]" (*Ibid*.) Relying on the *Thomas* court's emphasis on reflection, the court concluded that "'[t]he true test is not the duration of time as much as it is the extent of the reflection.'" (*People v. Bender, supra,* at p. 185, quoting *People v. Thomas, supra,* 25 Cal.2d at p. 900.)

These principles underpin more recent statements of premeditation and deliberation. "The very definition of 'premeditation' encompasses the idea that a defendant thought about or considered the act beforehand." (*People v. Pearson* (2013) 56 Cal.4th 393, 443.) "Deliberate" means """"formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.' [Citation.]" [Citation.]'" (*People v. Houston* (2012) 54 Cal.4th 1186, 1216.) Thus, "'[a]n intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.'" (*People v. Pearson, supra,* at p. 443.)

Courts have also emphasized that """"[t]he process of premeditation and deliberation does not require any extended period of time. 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .'

14

[Citations.]" [Citation.]'" (*People v. Houston, supra,* at p. 1216.) Judicial reliance on this language, however, has led to criticism that courts have "collapsed any meaningful distinction between first and second degree murder." (*People v. Solomon* (2010) 49 Cal.4th 792, 812, citing Mounts, *Premeditation and Deliberation in California: Returning to a Distinction Without a Difference* (2002) 36 U.S.F. L.Rev. 261, 327-328.) In response, our state Supreme Court reaffirmed the significance of "preexisting reflection, of any duration" to distinguish first degree murder (based on premeditation and deliberation) from second degree murder. (*People v. Solomon, supra,* at p. 813; accord, *People v. Houston, supra,* 54 Cal.4th at p. 1217.)

Here, the only *direct* evidence of defendant's mental state at the time of the shooting is defendant's statements to investigators and his testimony at trial. Although his statements regarding the shooting were inconsistent in significant respects, there is nothing in any of his statements to indicate that he considered shooting Marth beforehand or carefully weighed considerations for and against killing her. The evidence of such premeditation and deliberation, if any, was circumstantial.

The use of circumstantial evidence in proving first degree murder was discussed in *People v. Anderson* (1968) 70 Cal.2d 15 (*Anderson*). The court stated: "Given the presumption that an unjustified killing of a human being constitutes murder of the second, rather than of the first, degree, and the clear legislative intention to differentiate between first and second degree murder, [a reviewing court] must determine in any case

15

of circumstantial evidence whether the proof is such as will furnish a *reasonable foundation* for an inference of premeditation and deliberation [citation] or whether it 'leaves only to *conjecture and surmise* the conclusion that defendant either arrived at or carried out the intention to kill as the result of a concurrence of deliberation and premeditation.'" (*Id.* at p. 25.)

An inference is a "conclusion reached by considering other facts and deducing a logical consequence from them." (Black's Law Dict. (8th ed. 2004) p. 793, col. 2.) "The strength of an inference may vary widely. In some circumstances, the preliminary facts may virtually compel the conclusion. In other circumstances, the preliminary facts may minimally support the conclusion. But to constitute an inference, the conclusion must to some degree reasonably and logically follow from the preliminary facts. If, upon proof of the preliminary facts, the conclusion is mere guesswork, then we refer to it by such words as speculation, conjecture, surmise, suspicion, and the like; and it cannot rise to the dignity of an inference." (*People v. Massie* (2006) 142 Cal.App.4th 365, 373-374.)

The defendant in this case gave multiple false versions of how Marth was shot. The question of whether a defendant's false denials of wrongdoing can support an inference that he committed the charged crimes was recently addressed in *People v. Velazquez* (2011) 201 Cal.App.4th 219. In rejecting such an inference, the *Velazquez* court stated: "The prosecution bears the burden to prove each element of the crimes charged. [Citation.] That burden is not met through mere disbelief of defendant's denial

16

that he committed the crimes. 'A reasonable inference "'may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work.'" [Citation.] It must logically flow from other facts established in the action.' [Citations.] Disbelief of defendant's testimony, without more, does not constitute 'other facts' from which logically flows the conclusion, beyond a reasonable doubt, that defendant did that which he denied doing." (*Id.* at p. 231.)

### 3. Analysis

The *Anderson* court provided guidelines "for the kind of evidence which is sufficient to sustain a finding of premeditation and deliberation." Such evidence "falls into three basic categories: (1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [citation]; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a

17

particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2). [¶] Analysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)." (*Anderson, supra,* 70 Cal.2d at pp. 26-27.)

To illustrate planning evidence, *Anderson* discussed the case of *People v. Hillery* (1965) 62 Cal.2d 692, in which "the defendant's surreptitious conduct[,] subjection of his victim to his complete control, and carrying off of his victim to a place where others were unlikely to intrude, can be described as 'planning' activity directly related to the killing." (*Anderson*, *supra*, 70 Cal.2d at p. 27.) In another case, planning evidence was found when the defendant left the victims to retrieve a rifle from his car and, after killing one victim, manually loaded a second shot into the gun's chamber to kill the second victim. (*People v. Thomas* (1992) 2 Cal.4th 489, 517.) There was also planning evidence in *People v. Young* (2005) 34 Cal.4th 1149, where the defendant, after being denied entry to a house, crashed through a living room window armed with a gun before killing a resident inside the house. From such evidence, the jury could infer that the "defendant 'considered the possibility of murder in advance' . . . ." (*Id.* at p. 1183.)

The present case lacks any planning evidence whatsoever. Defendant, along with his younger brother, picked up Marth from her house and drove back to his home, not to a remote or isolated location. The house was occupied by four other people who could

18

identify him. There is no evidence that defendant left the room or the house to get a gun, or that he even moved from his squatting position on the floor. Indeed, the only evidence regarding his possession of the gun was that he took it away from Marth just prior to the shooting. Defendant testified that he did not intend to shoot Marth. Although the jury could refuse to believe such testimony, such disbelief cannot support an inference "that defendant did that which he denied doing." (*People v. Velazquez, supra,* 201 Cal.App.4th at p. 231.)

Defendant's behavior following the shooting is of someone horrified and distraught about what he had done, not someone who had just fulfilled a preconceived plan. Immediately after the fatal shot, defendant tried to resuscitate Marth and directed his brother to "call the cops." Defendant could be heard crying in the background during the 911 call. He asked the first officer who arrived to call an ambulance and, when being taken to the police station, he cried and asked rhetorically how someone could "go on with their life when they see something like that." The evidence not only fails to support an inference of a plan to kill Marth, but strongly suggests *a lack* of a plan to kill. Even viewed in the light most favorable to the prosecution, there is no evidence of planning.

There is little or no relevant motive evidence here. The Attorney General points to Marth's text messages to Hughes and asserts that the jury may have inferred that "[defendant] was in a bad mood after being released from custody and he was angry with [Marth]." Other than the references to the text messages, the Attorney General does not

19

cite to evidence defendant was in a "bad mood" or "angry" with Marth. Even if such a mood or anger can be reasonably inferred from Marth's texts and could suggest the intent to kill, it is, at most, weak evidence of a motive suggesting premeditation and deliberation. The second *Anderson* factor refers not merely to a motive to kill, but to the kind of motive that "would in turn support an inference that the killing was the result of a 'pre-existing reflection' and 'careful thought and weighing of considerations' *rather than* 'mere unconsidered or rash impulse hastily executed.'" (*Anderson*, *supra*, 70 Cal.2d at p. 27, italics added.) The text messages and the evidence of a loud screaming argument, which the Attorney General relies on, do not suggest this kind of motive. To the contrary, any evidence of defendant's "bad mood" or "anger with the victim" indicates a motive to kill based on "'unconsidered or rash impulse hastily executed,'" not the sort of "'pre-existing reflection'" and "'careful thought and weighing of considerations'" required to find premeditation and deliberation. (*Ibid*.)

As for the manner of killing evidence, defendant shot Marth in the face. As noted above, this manner of killing supports the finding of malice necessary to convict defendant of murder. To support *first degree* murder, however, the prosecution must show more than an intent to kill. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080 (*Koontz*).) It must still establish that the gunshot to the face was pursuant to a "'preconceived design' to take his victim's life . . . ." (*Anderson, supra,* 70 Cal.2d at p. 27.)

Even when manner of killing evidence is strong, cases in which findings of premeditation and deliberation are upheld typically involve planning and motive evidence as well. For example, in *People v. Cruz* (1980) 26 Cal.3d 233, the defendant killed one of his victims, his wife, by crushing her skull with a pipe and shooting her in the face with a shotgun. (*Id.* at pp. 240, 245.) The court held that the finding of premeditation and deliberation was supported by "all three types of evidence specified in *Anderson*" (*id.* at p. 245); the defendant resented the victims (motive), snuck out of his house to secure a pipe and load a shotgun (planning), and returned to the house to kill one of his victims by crushing her skull with the pipe followed by a shotgun blast to the face (manner of killing). In *People v. Mendoza* (2011) 52 Cal.4th 1056, the defendant shot a police officer in the face, killing him. (*Id.* at p. 1063.) In upholding the first degree murder conviction, the court relied not only on evidence of the manner of killing, but also on evidence that the defendant "devised a plan to kill [the officer] once the officer indicated he would conduct a weapons search," and had a motive for the killing—to avoid arrest and parole revocation. (*Id.* at p. 1070.)

Here, as discussed above, there is no evidence of any plan to kill Marth and little or no meaningful evidence of a motive to kill her.

Cases that have found sufficient evidence of premeditation and deliberation in the absence of planning or motive evidence are those in which "[t]he manner of the killing clearly suggests an execution-style murder." (*People v. Hawkins* (1995) 10 Cal.4th 920,

21

956, overruled on other grounds in *People v. Lasko* (2000) 23 Cal.4th 101, 110; see also *People v. Bloyd* (1987) 43 Cal.3d 333, 348.)  In *Hawkins*, the victim was found in a ditch in an open field with two gunshot wounds:  one in the back of the neck and one in the back of the head near the base of the skull.  (*People v. Hawkins, supra,* 10 Cal.4th at p. 956.)  There was also evidence that the victim was crouching or kneeling at the time.  (*Ibid*.)  The court concluded:  "In sum, although evidence of planning and motive was indeed minimal if not totally absent in the present case, we conclude that the manner-of-killing evidence was sufficiently strong to permit a trier of fact to conclude beyond a reasonable doubt that defendant committed the . . . murder with premeditation and deliberation."  (*Id.* at p. 957.)  In *Bloyd*, two people were killed; one victim was lying down on her back and another was kneeling.  The first victim "died from a pointblank gunshot wound to the head that entered the brain."  (*People v. Bloyd, supra,* 43 Cal.3d at p. 342.)  The bullet in the second victim "went down, back to front, and left to right, through the midportion of the brain, and exited just below the ear lobe on the right side."  (*Ibid.*)  The evidence of "cold and calculated—execution-style killings," the court explained, "was very strong evidence of deliberation and premeditation[.]"  (*Id.* at p. 348.)

Here, the Attorney General does not assert that the shooting of Marth was an "execution-style" murder.  Nor is there any evidence from which jurors could reasonably infer such a manner of killing.  None of the events preceding the shooting or its location

22

suggests an execution. Unlike the shots to the head from behind in *Hawkins* and *Bloyd*, defendant and Marth were facing toward each other, and there is no evidence that Marth was crouching or kneeling at the time. Although the gun was only 12 inches away from Marth when fired, the bullet completely missed Marth's brain; and although the gun still held five live rounds, no second shot was fired. Defendant's actions immediately afterward—directing Brenton to call 911 and attempting to resuscitate Marth and seek medical aid—are not the actions of an executioner. In short, the manner of killing Marth was not "so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' . . . ." (*Anderson, supra,* 70 Cal.2d at p. 27.)

With no evidence of planning or motive and a killing that cannot be described as "execution-style," the application of the *Anderson* factors weigh heavily in favor of concluding there was insufficient evidence for a reasonable jury to conclude that the killing was the result of premeditation and deliberation.

As the Attorney General points out, the *Anderson* factors are not exhaustive or exclusive of other considerations. Indeed, our Supreme Court has cautioned that an "'[u]nreflective reliance on *Anderson* for a definition of premeditation is inappropriate. The *Anderson* analysis was intended as a framework to assist reviewing courts in assessing whether the evidence supports an inference that the killing resulted from preexisting reflection and weighing of considerations. It did not refashion the elements of first degree murder or alter the substantive law of murder in any way.' [Citation.]"

23

(*Koontz*, *supra*, 27 Cal.4th at p. 1081.) The question thus remains whether, in light of the whole record, there is substantial evidence from which rational jurors could have found that defendant's killing of Marth was the result of preexisting thought and the careful weighing of considerations. (See *Jackson v. Virginia, supra,* 443 U.S. at pp. 318-319; *People v. Johnson, supra,* 26 Cal.3d at pp. 577-578.)

The Attorney General emphasizes three aspects of the evidence to support premeditation and deliberation. First, the Attorney General argues that defendant did not shoot Marth during the "[l]oud and screaming argument" heard by Williams, but did so only after the screaming ended. This, the Attorney General contends, "reasonably supports the inference that [defendant] had time to consider his actions before [h]e pointed his Taurus pistol at [Marth's] face and fired from close range." However, "'"[t]he true test [of premeditation and deliberation] is not the duration of time as much as it is the extent of the reflection. . . ." [Citations.]' [Citation.]" (*Koontz, supra,* 27 Cal.4th at p. 1080.) Thus, the mere fact that a defendant has time to consider his actions is, without more, insufficient to support an inference that the defendant *actually* premeditated and deliberated. Indeed, if the mere passage of time was enough to infer premeditation and deliberation, then virtually any unlawful killing with malice aforethought would be first degree murder because premeditation and deliberation does not require any extended period of time. (See *ibid.*) As discussed above, however, premeditation and deliberation is not synonymous with malice aforethought (*People v.*

24

*Bender, supra,* 27 Cal.2d at p. 180); it requires "substantially more reflection." (*People v. Thomas, supra,* 25 Cal.2d at p. 900.) Clearly, there must be some evidence that the defendant actually engaged in such reflection, and not merely had the time to do so.

For this argument, the Attorney General relies on *People v. Harris* (2008) 43 Cal.4th 1269. In that case, a mother worked at a donut shop and took her daughter to work with her. (*Id.* at p. 1277.) The mother tapped at a door to signal the daughter to open it. As the daughter approached the door, defendant was standing at the service window. The daughter attempted to open the door for her mother, but could not. The mother told the daughter to wait on the customer. The daughter took the defendant's order and began to prepare it. The defendant then attacked and killed the mother with a butcher knife. (*Ibid*.) The court held that there was sufficient evidence of premeditation and deliberation and explained: "In the time it took for [the daughter] to go from the door to the service window, and to take and prepare defendant's order, there was ample time for him to deliberate and premeditate before attacking [the mother]." (*Id.* at p. 1287.)

Contrary to the Attorney General's suggestion, *Harris* does not hold that premeditation and deliberation can be inferred whenever the defendant had time to premeditate and deliberate. The facts in *Harris* indicate that the defendant had a reason to be at the service window (to buy donuts) and left his position at the window to go to the door where he had no reason to be other than to attack the mother. This implies that

he made the decision to attack the mother while he was at the service window before walking to the door to carry out his plan. It was not the mere passage of time that was significant, but the fact that the defendant's actions imply that he made the decision to kill while he was at the service window and then considered the decision as he walked to the door to commit the murder. Here, by contrast, there is no fact analogous to leaving the donut store service window or other evidence that defendant had given any thought or consideration to killing Marth.

*Harris* was followed in *People v. Nelson* (2011) 51 Cal.4th 198. The *Nelson* court relied on *Harris* to conclude that the defendant in *Nelson* "had ample time to premeditate and deliberate" before attempting to shoot his intended victim. (*Id.* at p. 213.) The court did not hold that having such ample time was itself sufficient to infer premeditation and deliberation. As the court further explained, the defendant "formed an intent to kill and took several steps to achieve that end. He took up a firearm, climbed out of a moving car, sat on the window frame, reached across the roof, braced himself, and aimed at Doe." (*Ibid.*) Thus, as in *Harris*, there was evidence in *Nelson* that the defendant formed an intent to kill and then took steps—which took "ample time"—before aiming his gun at the intended victim. Here, by contrast, there is no substantial evidence from which the jury could determine the point (if any) when defendant formed the intent to kill or any steps thereafter taken to fulfill that goal.

Next, the Attorney General argues, "[t]he close-range shooting . . . supports a rational inference by the jury of premeditation and deliberation."  For this argument, the Attorney General cites to *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, *People v. Marks* (2003) 31 Cal.4th 197, and *Koontz, supra,* 27 Cal.4th at page 1082.  These cases are distinguishable from ours in that they all had other types of *Anderson* evidence in addition to a close-range shooting.

In *Gonzales and Soliz*, the defendants were members of a Hispanic street gang. (*People v. Gonzales and Soliz, supra,* 52 Cal.4th at p. 263.)  They and others were in a car when they saw two or three African-American men from a rival gang standing in the driveway of a gas station.  (*Id.* at pp. 268-270.)  The defendants recognized the men and told the driver of the car to go back to the gas station.  (*Id.* at p. 270.)  One of the defendants shot the African-American men.  (*Id.* at p. 269.)  When one of the victims started to crawl away, the shooter walked up and shot him again.  (*Ibid.*)  One of the victims had been shot from behind while kneeling on the ground with the shooter standing over him; the other had been shot seven times, including two fatal wounds to the head.  (*Id.* at p. 271.)  In holding that there was sufficient evidence of premeditation and deliberation, the court stated:  "Here, the evidence of motive was that defendants targeted [the victims] for a gang retaliation murder . . . .  This motive evidence supported the inference that defendants, who were armed at the time, had the prospect of retaliation in mind and quickly decided to commit the murders once they identified potential targets.

A reasonable inference, therefore, is that defendants formed the intent to commit premeditated and deliberate murder as early as when they asked the driver to turn the car around and return to the gas station to confront [the victims]. . . .” (*Id.* at p. 295.) As for “manner” evidence, the court stated: “The manner of killing—a close-range shooting without any provocation or evidence of a struggle—additionally supports an inference of premeditation and deliberation.” (*Ibid.*)

In *Marks*, the defendant and his girlfriend entered the victim’s taxi without any money to pay for the ride. (*People v. Marks, supra,* 31 Cal.4th at p. 206.) They arrived at their destination and the defendant asked his girlfriend to exit the taxi. (*Ibid.*) She went into an alley and then heard a gunshot from where the taxi was parked. (*Ibid.*) The defendant shot the driver in the face, killing him. (*Ibid.*) The Supreme Court stated that “[t]he shooting . . . manifested all three [*Anderson*] factors. Defendant ordered [his girlfriend] out of the taxi, which supports the inference that he did so to remove her from the scene before he killed. Moreover, if he brought a gun rather than money with which to pay for the taxi ride, it supports the inference that he planned a violent encounter with [the victim]. [Citations.] Defendant was found with seven $1 bills, whereas [the victim] was found with no bills (nor was any money found in the car), which tends to show a robbery motive. Finally, the manner of the killing, a close-range shooting without any provocation . . . or evidence of struggle, likewise demonstrates premeditation and deliberation.” (*Id.* at p. 230.)

28

In *Koontz*, the court summarized the facts as follows: "Defendant, having armed himself in the early morning hours with two concealed and loaded handguns, argued with the victim in the apartment they shared. When the victim sought refuge in [a security guard's office], located in a different apartment in the complex, defendant pursued him and persisted in the argument . . . . After [the security guard] unsuccessfully exhorted the two men to resolve their differences . . . defendant said, 'All right, I'll settle it.' Defendant then entered the office, locked the door and pulled a handgun from the waistband of his pants. After the victim refused defendant's demand for his car keys, defendant fired a shot at the victim's abdomen. He then took active steps to prevent [the security guard] from summoning medical care, without which the victim was certain to die." (*Koontz, supra,* 27 Cal.4th at pp. 1081-1082.) The court concluded: "Applying the *Anderson* guidelines, we easily find evidence of planning (defendant's arming himself and following the victim to the [security guard's] office), motive (to effectuate a robbery), and a manner of killing indicative of a deliberate intent to kill (firing a shot at a vital area of the body at close range, then preventing the witness from calling an ambulance). These facts suffice to support a verdict of premeditated and deliberate first degree murder." (*Id.* at p. 1082.)

*Gonzales and Soliz, Marks*, and *Koontz* are easily distinguishable from the present case. In each case cited by the Attorney General, the evidence indicated the defendants decided to confront and kill the victims some time prior to the shooting. In *Gonzales and*

29

*Soliz*, the armed defendants turned their car around to confront the victims; the defendant in *Marks* entered the taxi with a gun without the ability to pay for the cab ride; and the armed defendant in *Koontz* pursued the victim to the apartment complex security office and announced that he would "settle it." Such evidence supports reasonable inferences that the killings were planned. Each defendant also had a motive (e.g., gang retaliation or robbery) that suggested the killing was the result of a pre-existing reflection, careful thought, and the weighing of considerations. Significantly, in none of these cases did the Supreme Court indicate that each defendant's manner of shooting would be sufficient to support the premeditation and deliberation finding in the absence of evidence of planning and motive.

Lastly, the Attorney General argues, defendant's "act of shooting [Marth] does not bear the characteristics of a rash impulse because he took the time to pull back the hammer, point the pistol at [Marth's] face, and fire the weapon." Pulling the hammer back on a loaded gun and pointing it at another is certainly evidence of an intentional act performed with conscious disregard for human life, i.e., acting with implied malice.[4] However, the Attorney General provides no authority for the argument that these actions, without more, are sufficient to support a finding of premeditation and deliberation.

---

[4] We note that cocking, aiming, and firing a revolver essentially describes the act of shooting with a revolver. If these actions could, without more, constitute premeditation and deliberation, we would effectively add killing perpetrated by a revolver to the list of crimes specifically enumerated in section 189 and thereby substantially broaden the scope of first degree murder and eliminate the purposeful division created by the Legislature.

30

Although the cocking of a loaded rifle was one factor supporting such a finding in *People v. Gonzalez* (2012) 54 Cal.4th 643, there was also uncontroverted evidence of the defendant's plan to attack the victim by ambush with the loaded rifle and a motive to kill the victim because of a conflict between the victim and the defendant's brother. (*Id.* at pp. 663-664.) There is nothing in *Gonzalez* to suggest that the mere cocking of the loaded rifle would be sufficient to support a finding of premeditation and deliberation.

A first degree murder conviction premised upon premeditation and deliberation requires more than a showing of the intent to kill; it requires evidence from which reasonable jurors can infer that the killing is the result of the defendant's preexisting thought and reflection. (*People v. Solomon, supra,* 49 Cal.4th at pp. 812-813; *Koontz, supra,* 27 Cal.4th at p. 1080.) Here, viewing the evidence in the entire record in the light most favorable to the prosecution, we conclude that there is ample evidence to support the jury's verdict of murder, but insufficient evidence to support the finding that defendant killed Marth with premeditation and deliberation. We will therefore reduce the conviction to second degree murder. (See *People v. Steger* (1976) 16 Cal.3d 539, 553; § 1260.)

B. *Failure to Instruct, Sua Sponte, on Voluntary Manslaughter*

Defendant was charged with first degree murder. At trial, the jury received instructions regarding the crimes of involuntary manslaughter, first degree murder, and second degree murder. The court was not requested to, and did not, instruct on voluntary

31

manslaughter. Defendant argues that the court should have instructed the jury, sua sponte, on voluntary manslaughter under a heat of passion theory because it is a lesser included offense of murder and there was substantial evidence at trial that the killing was a "heat of passion" killing. We reject this contention.

The law is well settled on this issue. "'[A] trial court must instruct on lesser included offenses, even in the absence of a request, whenever there is substantial evidence raising a question as to whether all of the elements of the charged offense are present.' [Citation.] Conversely, . . . a trial judge has no duty to instruct on any lesser offense *unless* there is substantial evidence to support such instruction." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1008.)

Voluntary manslaughter is a lesser included offense of murder. (*People v. Beltran* (2013) 56 Cal.4th 935, 942; *People v. Breverman* (1998) 19 Cal.4th 142, 154.) Thus, in a murder case, instructions on voluntary manslaughter must be given to the jury if there is substantial evidence to support it. (*People v. Breverman, supra,* at p. 160.)

"[T]he existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury." (*People v. Breverman*, *supra*, 19 Cal. 4th at p. 162.) "'Substantial evidence' in this context is "'evidence from which a jury composed of

32

reasonable [persons] could . . . conclude[]"' that the lesser offense, but not the greater, was committed." (*Ibid*.)

"[T]he factor which distinguishes the 'heat of passion' form of voluntary manslaughter from murder is provocation. The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim. [Citations.] The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection." (*People v. Lee* (1999) 20 Cal.4th 47, 59.)

Thus, in order for the trial court to have had a sua sponte duty to instruct, there must have been substantial evidence of such a provocation. In our case, there was not. The evidence includes the text messages indicating that defendant and Marth were fighting and the testimony by Williams and a police officer that Williams was awakened by "[l]oud screaming." Although such evidence suggests a verbal fight or argument between defendant and Marth, there is no evidence about its duration, nature, or intensity. Without evidence to determine these facts, the jurors could not reasonably determine if the argument would have provoked an ordinary person to act rashly or without due deliberation and reflection. For that reason, there was not substantial evidence that the

33

killing occurred in a heat of passion.  Therefore, the trial court had no sua sponte duty to instruct the jury on that theory.

Defendant asserts that "[g]iven the absence of evidence of deliberation and premeditation and given [defendant's] uncontrollable anguish in the immediate aftermath of the shooting, the worst that can be inferred is that he 'saw red' during the . . . heated argument."  However, the absence of premeditation and deliberation *is not* affirmative evidence that defendant acted "rashly or without due deliberation and reflection" *as a result of a provocation*.

Defendant further stated that "[t]here is as much evidence that the killing was committed in the heat of passion as there is that malice was present, because heat of passion can involve 'any violent or intense emotion that causes a person to act without due deliberation and reflection.'"  We disagree.  There is, as discussed above (and as defendant concedes), substantial evidence that the killing was committed with at least implied malice; i.e., as a result of an intentional act, the natural consequences of which are dangerous to human life, deliberately performed with knowledge of the danger to, and with conscious disregard for, human life.  There is not, however, substantial evidence that the killing was committed in the heat of passion.

Even if we agreed with defendant that the court had a duty to instruct as to voluntary manslaughter, the error would have been harmless.

The failure to instruct as to a lesser included offense is reviewed under the *Watson*[5] standard for prejudice. (*People v. Moye* (2009) 47 Cal.4th 537, 555-556; *People v. Breverman*, *supra*, 19 Cal.4th at p. 178.) Under *Watson*, a reviewing court will reverse a judgment "only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Watson, supra,* 46 Cal.2d at p. 836.) With no evidence that establishes the intensity, duration, or subject matter of the fight, it is not reasonably probable that the jury would have found defendant guilty of voluntary manslaughter. Thus, under the *Watson* standard, any error was harmless.

C. *Giving CALCRIM No. 224 Instead of CALCRIM No. 225*

At trial, defense counsel requested that the court instruct the jury with CALCRIM No. 225. The court denied this request and instead instructed the jury with CALCRIM No. 224. Defendant claims this was prejudicial error. We hold that the court did err by giving CALCRIM No. 224, but conclude that the error was harmless.

1. <u>CALCRIM Nos. 224 and 225</u>

"CALCRIM No. 224 is a form jury instruction that describes the manner in which the jury is to consider circumstantial evidence that the prosecution offers to prove facts

---

[5] *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*).

35

necessary to find a defendant guilty." (*People v. Contreras* (2010) 184 Cal.App 4th 587, 591.)

CALCRIM No. 224 reads: "Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt. [¶] Also, before you may rely on circumstantial evidence to find the defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty. If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."

"CALCRIM No. 225 is a form jury instruction that describes the manner in which the jury is to consider circumstantial evidence that the prosecution offers to prove a defendant's intent or mental state." (*People v. Contreras, supra,* 184 Cal.App.4th at p. 592.)

CALCRIM No. 225 reads: "The People must prove not only that the defendant did the act[s] charged, but also that (he/she) acted with a particular (intent/ [and/or] mental state). The instruction for (the/each) crime [and allegation] explains the (intent/ [and/or] mental state) required. [¶] A[n] (intent/ [and/or] mental state) may be proved by

circumstantial evidence. [¶] Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonably doubt. [¶] Also, before you may rely on circumstantial evidence to conclude that the defendant had the required (intent/ [and/or] mental state), you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant had the required (intent/ [and/or] mental state). If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions supports a finding that the defendant did have the required (intent/ [and/or] mental state) and another reasonable conclusion supports a finding that the defendant did not, you must conclude that the required (intent/ [and/or] mental state) was not proved by the circumstantial evidence. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."

The Bench Notes to both jury instructions detail under what circumstances each is to be read. The Bench Notes for CALCRIM No. 224 (2011) pages 56 and 57 state: "If intent is the only element proved by circumstantial evidence, do not give this instruction. Give CALCRIM No. 225 . . . ." Conversely, the Bench Notes for CALCRIM No. 225, *supra*, pages 59 and 60 state: "Give this instruction when the defendant's intent or mental state is the only element of the offense that rests substantially or entirely on

37

circumstantial evidence. If other elements of the offense also rest substantially or entirely on circumstantial evidence, do not give this instruction. Give CALCRIM No. 224 . . . ."

Therefore, if the only element that rested substantially or entirely on circumstantial evidence was the defendant's intent, CALCRIM No. 225 should have been read. In the present case, defendant's intent was the only element that rested substantially on circumstantial evidence.

In denying defense counsel's request for CALCRIM No. 225, the trial court judge explained: "The entire case is circumstantial. So I'm giving [CALCRIM No.] 224." The court further stated that the prosecution is "relying on circumstantial evidence as to who fired the gun. [¶] . . . [¶] . . . And who owned the gun because there were other people in the room." On appeal, the Attorney General contends: "[C]ontrary to [defendant]'s assertions otherwise, the record reveals that the prosecutor relied upon circumstantial evidence not only to prove the mental state for murder, but also to prove motive and the manner of killing."

Both the trial judge and the Attorney General are mistaken. The prosecution was not relying on circumstantial evidence to prove who fired the gun or who owned the gun. Defendant, by his own admission, stated that he owned the gun and pulled the trigger. The lack of any dispute on this point was noted in the prosecutor's closing argument: "Murder requires that the defendant committed an act that caused the death of Rebecca

Marth. That is undisputed. He did an act that caused her death. [¶] The second element is that when he acted, he had a state of mind called malice aforethought. . . ."

Although the prosecution relied on circumstantial evidence to prove a motive and the manner of killing, neither motive nor the manner of killing are elements of the offense of murder. They are relevant to prove malice aforethought, premeditation, and deliberation—all mental states.

Because defendant admitted the gun was his and that he was the person who pulled the trigger, the actus reus in this case did not rely either substantially or entirely on circumstantial evidence. Accordingly, the only element of the offense of murder that substantially or entirely relied on circumstantial evidence was the mental state or intent element: malice aforethought. Thus, the court erred in denying defense counsel's request for CALCRIM No. 225.

2. Harmless Error

"Instructional error is subject to harmless error review." (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 214.) When trial error implicates a criminal defendant's federal constitutional rights, the reviewing court must "be able to declare a belief that [the error] was harmless beyond a reasonable doubt" before it can find the error not prejudicial or harmless. (*Chapman v. California* (1967) 386 U.S. 18, 24.) If, on the other hand, the error arises under state law or state procedure, a more forgiving standard of review is appropriate under the *Watson* test. (*Watson, supra,* 46 Cal.2d at p. 836.) Under this test,

the error is harmless if there is no "reasonabl[e] probab[ility]" the error affected the

outcome. (*Ibid*.) A reasonable probability does not mean "more likely than not"; rather,

a reasonable probability exists when there is merely a "*reasonable chance*, more than an

*abstract possibility*" of a different outcome. (*College Hospital, Inc. v. Superior Court*

(1994) 8 Cal.4th 704, 715.)

Under either the *Chapman* standard or the *Watson* standard, we hold the error is

harmless. In *People v. Rodrigues* (1994) 8 Cal.4th 1060 (*Rodrigues*), the court faced an

analogous situation where the trial court gave CALJIC No. 2.01 rather than CALJIC No.

2.02. (*Rodrigues, supra,* at p. 1141.) Like CALCRIM No. 224, CALJIC No. 2.01

instructs on the sufficiency of circumstantial evidence to prove guilt; like CALCRIM No.

225, CALJIC No. 2.02 instructs more specifically on the sufficiency of circumstantial

evidence to prove a defendant's specific intent or mental state. (*Rodrigues, supra,* at p.

1141.) CALJIC No. 2.02 "'is designed for use *instead of* CALJIC [No.] 2.01 in a specific

intent or mental state case in which the *only element of the offense* which rests

substantially or entirely on circumstantial evidence is the element of specific intent or

mental state.'" (*Rodrigues, supra,* at pp. 1141-1142, fn. 46.) The defendant in *Rodrigues*

argued that the court erred in failing to give the more specific CALJIC No. 2.02.

(*Rodrigues, supra,* at p. 1141.) The Supreme Court explained that it did not need to

decide the merits of the argument, explaining that "[b]ecause the trial court delivered the

more inclusive instruction under CALJIC No. 2.01, its refusal to additionally instruct with CALJIC No. 2.02 clearly was not prejudicial error." (*Id.* at p. 1142.)

Here, as in *Rodrigues*, the more inclusive instruction was given. For that reason, the refusal to instruct with CALCRIM. No. 225 was not prejudicial error.

D. *Inadmissible Evidence/Ineffective Assistance of Counsel*

Defendant claims he was denied a fair trial by the admission of audio recordings of his interviews with police. He argues that portions of the recordings contained inadmissible character evidence. At trial, defense counsel failed to object to these portions of the recordings. For that reason, defendant additionally claims he was denied effective assistance of counsel. We conclude that defendant failed to preserve this claim on appeal and was not denied a fair trial or effective assistance of counsel.

The challenged portions of the interviews are statements made by defendant to police officers about his pending criminal cases involving his use of firearms and statements made about his "gang" or "crew." When asked if he was "on probation or anything like that," defendant said he had "cases pending." In one case he "got caught with a firearm." More recently, he had been charged with "discharging . . . a firearm in unfashionable manner . . . ." Relative to this charge, he said he bailed himself out on the morning Marth was shot. When he was later asked if he had ever fired a gun, he answered, "the gun that I got busted with," and added, "I had fired right before I got busted with it and I haven't fired one since." The officers also informed defendant that

41

"[e]arlier that night people saw you go by . . . the brothers that you guys were having a problem with . . . . [¶] . . . [¶] . . . [w]ent by the house and shot your gun in the air when you got down the street." Defendant responded: "I hate that, no fucking way. I would never, never shoot my, shoot a gun out of my car."

Regarding the reference to a gang, defendant told the officers: "When my ex-fiancé[e] and I started having problems I ran back to the gang. I ran into [Marth]. I pretty much left my ex-fiancé[e] for her." The detectives questioned defendant about this "gang," asking, "is that a legit . . . . [¶] . . . [¶] . . . group?" Defendant clarified, "It's like fucking five of 'em" and "some other people will try to claim it and we'll clown on 'em cause it's like five, I mean . . . . [¶] . . . [¶] . . . it's not a gang. It's not a [clique]. [¶] . . . [¶] . . . And we don't even like bang it. . . . [¶] . . . [¶] . . . It's not like that."

Initially, we note that a lack of an objection generally forfeits the right to assert the issue on appeal. (Evid. Code, § 353.) "'It is, of course, "the general rule"' . . . '"that questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal."'" (*People v. Alvarez* (1996) 14 Cal.4th 155, 186.) Here, no timely objection was made; therefore, questions relating to the admissibility of the evidence need not be reviewed.

If the matter had been preserved for appeal, we would find no error in admitting the recorded interviews. Defendant contends the challenged evidence "was not relevant

to any issue in the case and was thus inadmissible." We disagree. Defendant's statements regarding his pending cases were relevant to the alleged on-bail enhancement under section 12022.1, subdivision (b). That statute states: "[A]ny person arrested for a secondary offense which was alleged to have been committed while that person was released from custody on a primary offense shall be subject to a penalty enhancement of an additional two years in state prison which shall be served consecutive to any other term imposed by the court." The fact that defendant had pending criminal cases and was out on bail was relevant to show that defendant had been released from custody in a pending case (i.e., the primary case) at the time he committed the charged offenses in this case (i.e., the secondary offenses).

His statements regarding his prior discharging of a firearm was relevant to the issue of mistake. It had some tendency to prove that defendant had prior knowledge and experience with firearms and, therefore, the shooting of Marth was not an accident attributable to a lack of experience in handling firearms.

Lastly, defendant's reference to his "gang" (which he said was not a gang or a clique) was tied to his statements regarding his relationship with Marth and his ex-fiancée. He said he "ran back to the gang" when he and his fiancée began "having problems." He then met Marth and left his fiancée. Such relationship evidence and the inextricable reference to his gang were relevant to the issue of whether he had a motive to kill Marth.

43

None of the challenged statements are inadmissible under Evidence Code section 352 or otherwise. The evidence that arguably had the most potential to be prejudicial was defendant's reference to his gang. However, this reference was isolated, brief, and promptly minimized by defendant as merely a group of five "friends," "not a gang" or a clique. They "don't even . . . bang it" and merely "clown" on people. Viewed in its context, the reference to a gang was not unduly prejudicial.

Because the challenged statements were admissible, the court did not err in allowing them into evidence and defendant was not deprived of a fair trial.

We now turn to defendant's contention that he was deprived of the effective assistance of counsel. For an appellant to prevail on this claim, he must show that defense counsel was not only deficient, but that this deficiency was prejudicial. "A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. . . . Second, the defendant must show that the deficient performance prejudiced the defense." (*Strickland v. Washington* (1984) 466 U.S. 668, 687.)

With regard to the first component, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." (*Strickland v. Washington, supra,* 466 U.S. at p. 688.) He "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" (*Id.*

at p. 689.) The failure to object to evidence ordinarily involves tactical decisions by counsel "and seldom establish[es] a counsel's incompetence." (*People v. Frierson* (1979) 25 Cal.3d 142, 158.)

Here, defendant argues that "it is not possible to imagine a tactical benefit to failing to request that the offending material be redacted from the interview." Additionally, he claims, "[t]he only reasonable explanation is that counsel simply missed the references to that conduct in the interviews." We disagree.

As noted above, the challenged evidence was relevant to issues in the case and admissible. Counsel may have thus reasonably concluded that there was no benefit to asserting objections that likely would have been overruled. Moreover, there was a possible tactical benefit in allowing the interviews to be played in full—to show the jury he had nothing to hide. While the recordings contained information favorable to the prosecution, they also included his explanations of the unfavorable evidence. Perhaps more importantly, the interviews set the foundation for defendant's explanation of how the events unfolded that day. For example, when defendant testified as to the mosquito incident, the prosecutor asked: "You mentioned the mosquito to the police?" Defendant responded by citing the interviews: "I mentioned that there was a—that there was something that had happened . . . ." He continued on: "Detective Sanfilippo says, 'So there's no argument going on?' And I respond, 'No. We were joking. No, we were, we were joking. What happened was, uh, me and my little brother were, oh, we're like,

45

we're kind of like tag-teamed on a joke, and me and him started laughing, and she got mad.'"

Because the recordings contained both defendant's rebuttal to the unfavorable evidence presented against him, as well as the foundation for the defendant's version of the story, defense counsel may have tactically decided it would be best to have the jury hear the recording in its entirety. Because the challenged action may be considered "sound trial strategy," defendant has failed to establish that his counsel was constitutionally ineffective.

Furthermore, even if defendant's counsel's failure to object fell below the requisite standard of reasonableness, he has failed to establish prejudice. To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland v. Washington, supra,* 466 U.S. at p. 694.) The defendant "must carry his burden of proving prejudice as a 'demonstrable reality,' not simply speculation as to the effect of the errors or omissions of counsel." (*People v. Williams* (1988) 44 Cal.3d 883, 937.) He has failed to do so. As discussed above, the objections he claims his counsel should have made would probably have been overruled because the evidence was relevant and admissible. Even if his objections were made and sustained, any

46

possible prejudice due to his statements regarding his pending firearms charges and his "gang" of five friends is insufficient to undermine confidence in the outcome of this case.

E.  *Cross-examination Error*

Defendant contends the trial court erred when it refused to "rein in" the prosecutor while he was cross-examining defendant about his other pending firearms case.  We disagree.

The relevant testimony is as follows:

"Q:  That's the one that you got caught in Colton with; right?

"A:  Yes, sir.

"Q:  You had fired that gun before you got caught with it, didn't you?

"A:  Yes, sir.

"Q:  Fired it while you were in your vehicle, didn't you?

"A:  No, sir.

"Q:  Shell casings were found in your vehicle; right?

"A:  No, they were found in the gun.  [¶]  . . .  [¶]

"Q:  All right.  Now, the .32 or .38 that you were caught in Colton with, you understand that people had seen you shooting that just before you were caught with it— not at a gun range but on the street?

"[DEFENSE COUNSEL]:  I'm going to object.  This is [Evidence Code section] 1101 evidence.  Outside the scope and irrelevant.

47

"[PROSECUTOR]: Your Honor, it goes to impeachment. It's inconsistent—

"THE COURT: Well, I'll give you a little leeway, but you're wandering off into [Evidence Code section] 352 territory here.

"[PROSECUTOR:] Within hours of being caught with this gun in Colton, someone had seen you firing that gun from your vehicle in Riverside, hadn't they?

"A: No.

"Q: Well, it was reported, though, wasn't it?

"A: Reported—alleged does not mean it's the truth. No, sir. I was on the freeway, and I went straight to Colton.

"Q: Coincidentally, you got arrested in Colton two hours after someone reported you were shooting a gun from your car. Is that what you're saying?

"A: I never seen the reports on that, if that's what you're saying."

When the admissibility of evidence is at issue, abuse of discretion is the appropriate standard of review. (*People v. Rowland* (1992) 4 Cal.4th 238, 264.) Under this standard, a trial court's ruling "will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

The trial court did not abuse its discretion. As defendant notes, the court was clear: "[E]vidence that [defendant] was familiar with guns and had shot them before

48

would be admissible to show absence of mistake; however, it must not be used to show his 'proclivity' to use guns." Based on this explanation, the court's ruling—that the evidence was admissible for the purpose of showing the absence of mistake—was not an abuse of discretion. There was no error.

F. *Failure to Give a Limiting Instruction*

Defendant next claims his federal due process rights were violated because the court failed to give a limiting instruction, CALCRIM No. 375. CALCRIM No. 375 explains for what purpose the evidence of defendant's prior use of firearms could be used. We conclude that the court had no sua sponte duty to instruct on the limited admissibility of this evidence. Defendant's argument therefore fails.

In *People v. Collie* (1981) 30 Cal.3d 43, the California Supreme Court discussed the trial court's duty to give a limiting instruction regarding evidence of past criminal conduct: "Although the trial court may in an appropriate case instruct *sua sponte* on the limited admissibility of evidence of past criminal conduct, we have consistently held that it is under no duty to do so." (*Id.* at p. 63.) The court continued: "Neither precedent nor policy favors a rule that would saddle the trial court with the duty either to interrupt the testimony *sua sponte* to admonish the jury whenever a witness implicates the defendant in another offense, or to review the entire record at trial's end in search of such testimony. There may be an occasional extraordinary case in which unprotected evidence of past offenses is a dominant part of the evidence against the accused, and is both highly

49

prejudicial and minimally relevant to any legitimate purpose.  In such a setting, the evidence might be so obviously important to the case that *sua sponte* instruction would be needed to protect the defendant from his counsel's inadvertence.  But we hold that . . . in general, the trial court is under no duty to instruct *sua sponte* on the limited admissibility of evidence of past criminal conduct." (*Id.* at p. 64, fn. omitted.)

Indeed, the Bench Notes to CALCRIM No. 375 cite *Collie* and state:  "The court is only required to give this instruction **sua sponte** in the 'occasional extraordinary case in which unprotected evidence of past offenses is a dominant part of the evidence against the accused, and is both highly prejudicial and minimally relevant to any legitimate purpose.'"  (Bench Notes to CALCRIM No. 375, *supra*, p. 155, citing *People v. Collie, supra,* 30 Cal.3d at pp. 63-64.)

The present case is not an extraordinary case in which "evidence of past offenses is a dominant part of the evidence against the accused."  The questions regarding defendant's firearm use were few and limited.  This is not the "occasional extraordinary case" the *Collie* court imagined.  Therefore, the court had no sua sponte duty to instruct on the limited admissibility of the evidence.  Thus, with no request by counsel and no sua sponte duty to instruct, the trial court did not err by failing to give a limiting instruction.

G.  *The On-bail Enhancement*

The jury found true an enhancement allegation under section 12022.1 that defendant committed the murder and possession of marijuana for sale charged in this case

while released from custody pending trial on another felony offense. Based on this finding, the court imposed a two-year sentence enhancement. The court then granted the prosecutor's motion to dismiss without prejudice the prior felony offense referenced in the enhancement allegation. Defendant contends the two-year on-bail enhancement should be stricken because defendant was never convicted of the prior felony offense.

Section 12022.1, subdivision (b) states: "Any person arrested for a secondary offense which was alleged to have been committed while that person was released from custody on a primary offense shall be subject to a penalty enhancement of an additional two years in state prison which shall be served consecutive to any other term imposed by the court."

Section 12022.1, subdivision (a)(1) defines "primary offense" as "a felony offense for which a person has been released from custody on bail or on his or her own recognizance. . . ." "'Secondary offense' means a felony offense alleged to have been committed while the person is released from custody for a primary offense." (§ 12022.1, subd. (a)(2).)

Subdivision (d) of section 12022.1 explains how the section operates when the secondary offense is adjudicated first: "Whenever there is a conviction for the secondary offense and the enhancement is proved, and the person is sentenced on the secondary offense prior to the conviction of the primary offense, the imposition of the enhancement shall be stayed pending imposition of the sentence for the primary offense. The stay shall

be lifted by the court hearing the primary offense at the time of sentencing for that offense and shall be recorded in the abstract of judgment. If the person is acquitted of the primary offense the stay shall be permanent."

In *People v. Meloney* (2003) 30 Cal.4th 1145, the court explained the application of this enhancement in greater detail: "[W]hen . . . the secondary offense is adjudicated first and an on-bail enhancement is proved, the secondary-offense court may proceed in one of two ways: (1) The secondary-offense court may—following the express terms of section 12022.1, subdivision (d)—stay 'imposition of the enhancement.' . . . (2) Alternatively, the secondary-offense court may immediately consider whether to strike the enhancement under section 1385, or to impose the enhancement as part of the defendant's sentence. If the court concludes it is appropriate to exercise discretion to strike the enhancement, it may do so. If the court determines to *impose* the enhancement, it may do so, but it also must stay execution of that aspect of the sentence, pending resolution of the prosecution of the primary offense. If the court imposes the enhancement and stays its execution, that aspect of the imposed sentence becomes effective immediately upon the primary-offense court's order lifting the stay after the defendant has been convicted of the primary felony offense." (*Id.* at p. 1149.)

Here, the primary offense had not been adjudicated when defendant was sentenced in this case. Because the secondary offense was adjudicated first and the on-bail enhancement was proved, the court should have either "stay[ed] 'imposition of the

enhancement,'" stricken the enhancement under section 1385, or "*impose*[*d*] the enhancement . . . *but . . . stay*[*ed*] [*its*] *execution . . . pending resolution of the . . . primary offense.*" (*People v. Meloney, supra,* 30 Cal.4th at p. 1149, second italics added.) Here, the court imposed the enhancement, but erroneously failed to stay its execution. We will modify the judgment to stay the execution of the enhancement term.

Defendant contends the dismissal of the primary offense precludes execution of the enhancement term and the stay should therefore be permanent. We disagree. According to the statute: "If the person is *acquitted* of the primary offense the stay shall be permanent." (§ 12022.1, subd. (d), italics added.) Defendant was not acquitted of the primary offense. Rather, the primary offense was dismissed without prejudice. As the Attorney General correctly states: "[T]he prosecutor retains the authority, within the statutory limitations, to re-file and commence prosecution of that charge against [defendant]." Because defendant can still be charged and convicted of the primary offense, the stay should not be made permanent.

H. *Cumulative Error*

Lastly, defendant asserts the cumulative effect of the errors was so prejudicial as to require reversal of the judgment. We disagree. There were three errors——the failure to stay the execution of the on-bail enhancement, the insufficiency of the evidence of premeditation and deliberation, and the failure to read CALCRIM No. 225. We correct the first two of these; only the failure to read CALCRIM No. 225 was error, but harmless.

As such, there can be no accumulation of error sufficient to warrant reversal of the conviction.

## IV. DISPOSITION

The judgment is modified such that the conviction of first degree murder is reduced to second degree murder and the execution of the on-bail enhancement under section 12022.1, subdivision (b) is stayed pending final resolution of the primary offense. As modified, the judgment is affirmed. On remand, the court shall resentence defendant in light of the modified judgment. Following resentencing, the trial court is directed to prepare a minute order and an amended abstract of judgment to reflect the modification of the sentence and to forward a certified copy of the amended abstract to the Department of Corrections and Rehabilitation.

CERTIFIED FOR PARTIAL PUBLICATION

KING _____
J.

We concur:

HOLLENHORST _____
Acting P. J.

CODRINGTON _____
J.