Filed 6/7/16  P. v. Trujillo CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>BRYAN TRUJILLO,<br><br>    Defendant and Appellant. | B263433<br><br>(Los Angeles County<br>Super. Ct. No. YA088548) |


APPEAL from a judgment of the Superior Court of Los Angeles County, Mark S. Arnold, Judge.  Affirmed.


Jennifer Peabody, under appointment by the Court of Appeal, for Defendant and Appellant.


Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Rene Judkiewicz, Deputy Attorneys General, for Plaintiff and Respondent.


* * * * * *

Bryan Trujillo appeals from his judgment of conviction for first degree premeditated murder (premeditated murder) of his mother, Emma Rodriguez. Appellant contends there was insufficient evidence of premeditation and deliberation, and moreover, the court erred in refusing to instruct on voluntary manslaughter. We affirm.

**FACTS**

Sofia Noriega had been friends with appellant's mother, Rodriguez, since appellant was four years old. Noriega and Rodriguez were so close they were like sisters. In August or September 2013, Noriega was riding in the car with Rodriguez and appellant. Appellant told his mother that he was going to kill her on that occasion. Noriega told appellant he should not talk to his mother like that. He replied, "Shut up, bitch or I will kill you too." He said this in a "nasty way" and did not sound like he was joking. Noriega had seen appellant fight with his mother and be verbally abusive towards her many times.

In September 2013, Noriega received a call from Rodriguez, who was very scared because appellant "was going crazy" in her basement. He had broken a computer with his fist and had broken a telephone. Rodriguez was crying and shaking. Noriega advised Rodriguez to leave her home and come to Noriega's, which she did.

Kim Joseph Wescott was married to Rodriguez from 2002 to 2007 but maintained contact with her even after they divorced. He felt appellant became moodier as he got older. Appellant and his mother would argue over his lack of work and failure to find a job.

Wescott and Rodriguez co-owned a house. In October 2013, a number of people lived on the property, including Rodriguez and appellant. Wescott and his adult son, Anthony Wescott (Anthony), lived in a two-room extension to the main house. Renters lived in the main house. Rodriguez stayed in a unit behind the garage, and appellant was staying with her temporarily.

On October 2, 2013, Marcelino Funes received a call from Rodriguez at approximately 9:00 a.m. Funes had known her for several years and had done work for her before, and on that date she asked him to replace a window. He agreed, and

2

Rodriguez picked him up and drove him to her house. In the car they talked about how Rodriguez was "very angry" with appellant because he had caused trouble with the neighbors. She said she was going to "throw[] him out on the street." Funes was familiar with appellant and had interacted with him approximately three times before that day.

When Rodriguez and Funes arrived at her house, she asked him to measure the window. She said appellant would be coming home, and she also asked Funes to tell appellant "to bring all his things out of his room and to lock the door." Rodriguez then left in her car. Appellant arrived about 30 minutes later, and Funes relayed Rodriguez's message. Appellant just laughed. Funes "told him to change his lifestyle, that his lifestyle was not right."

Appellant went inside and Funes sat on the patio. Appellant came back outside and sat on the patio with Funes. Appellant asked if Funes was waiting for Rodriguez, and Funes responded, "yes." Appellant asked him the same question three times but did not say anything else. Rodriguez called Funes's cell phone while they were sitting on the patio and asked to speak to appellant. Appellant refused to speak to her and went to the backyard area to talk to Anthony.

Approximately an hour after Rodriguez left, she returned home and looked "very angry." She asked Funes to measure the window again and went to the backyard area to talk to appellant. Funes could not report on what she said because Rodriguez was speaking English, and Funes is a Spanish speaker. Rodriguez talked "louder" to appellant for approximately 10 minutes; Funes did not hear appellant respond to her during this time. Anthony said he heard appellant and Rodriguez arguing outside around that time, although he characterized it as a disagreement and not "screaming at each other or anything like that."

Rodriguez then went to the patio and sat with Funes, and appellant went to the back of the property, where the unit he shared with Rodriguez was located. Rodriguez said she was going to take Funes to Home Depot in a few minutes and would "be right back." She walked toward the back of the property as well.

3

Funes waited approximately 15 minutes on the patio, and then appellant walked out alone. During that 15 minutes, Funes did not hear any sounds of a struggle or fight. Appellant grabbed his backpack and skateboard and walked out to the street.

Funes waited approximately 20 more minutes on the patio for Rodriguez and then went to look for her. He found her on the floor of her unit with blood next to her and called 911. The paramedics arrived approximately eight minutes later, but Rodriguez had already died.

Rodriguez had a number of injuries from multiple blows or strikes. She had lacerations and hemorrhaging to both eyes and eye sockets, resulting in black eyes; lacerations above both eyebrows and on her lip; abrasions and lacerations all over her scalp; bruises on her chest, neck, face, and arm; and numerous fractures to ribs on both sides of her body. She suffered bleeding beneath the scalp, or subgaleal hemorrhaging; bleeding beneath the thickest and outermost of the three membranes covering the brain, or subdural hemorrhaging; and bleeding beneath a deeper membrane of the brain, or subarachnoid hemorrhaging. Such hemorrhaging indicated a significant amount of force used in the injuries to her skull, scalp, and brain.

Rodriguez also had indices of neck compression or strangulation, including linear scrapes on her neck in an up-and-down direction, which might have occurred as a result of someone drawing fingernails down the neck in a defensive posture; petechial hemorrhaging, or tiny pinpoint hemorrhaging in the eyes; hemorrhaging on her tongue, indicating repeated bites to her tongue; hemorrhaging in her neck muscles on both sides; and fractures in the hyoid bone and cartilage of the neck. The fractures to her ribs indicated a strong possibility of someone sitting on her chest. Strangling someone to death takes two to three minutes of continual pressure. Strangulation would take longer if the victim were resistant. The damage to Rodriguez's face and neck would have required at least five to seven blows. The medical examiner concluded Rodriguez's cause of death was multiple blunt force trauma. He could not rule out strangulation as a contributing factor in her death.

Rodriguez's blood was found on the jacket, shirt, sock, pants, and right shoe appellant was wearing when arrested, as well as on the bottom of his skateboard.

The jury convicted appellant of premeditated murder. (Pen. Code, §§ 187, subd. (a), 189.)[1] The court sentenced appellant to 25 years to life imprisonment. Appellant filed a timely notice of appeal.

## DISCUSSION

### 1. *Sufficiency of the Evidence of Premeditation and Deliberation*

Appellant contends we must reverse because the prosecution presented insufficient evidence of premeditation and deliberation. We disagree.

In evaluating appellant's contention, we "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence— that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) We "resolve[] neither credibility issues nor evidentiary conflicts. [Citation.] Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) Even if we might have made different factual findings or drawn different inferences than the jury, we do not reverse the judgment if the circumstances reasonably justify the factual findings of the jury. (*People v. Perez* (1992) 2 Cal.4th 1117, 1126 (*Perez*).)

First degree murder is a "willful, deliberate, and premeditated killing." (§ 189.) "To prove the killing was 'deliberate and premeditated,' it shall not be necessary to prove the defendant maturely and meaningfully reflected upon the gravity of his or her act." (*Ibid.*) Moreover, deliberation and premeditation do not necessarily require any extended period of time. "'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated

---

[1] Further undesignated statutory references are to the Penal Code.

judgment may be arrived at quickly . . . .'" (*Perez, supra*, 2 Cal.4th at p. 1127, quoting *People v. Thomas* (1945) 25 Cal.2d 880, 900.)

In *People v. Anderson* (1968) 70 Cal.2d 15, 26-27 (*Anderson*), our high court identified three categories of circumstantial evidence bearing on premeditation and deliberation: (1) planning activity prior to the murder; (2) motive to kill; and (3) manner of killing. From a survey of cases, the court noted that premeditated murder typically involved all three types of evidence, "at least extremely strong evidence" of planning activity, or evidence of motive in conjunction with either planning activity or manner of killing. (*Id.* at p. 27.) *Anderson* did not, however, purport to define the elements of first degree murder or "establish an exhaustive list that would exclude all other types and combinations of evidence." (*Perez, supra*, 2 Cal.4th at p. 1125.) "The *Anderson* guidelines are descriptive, not normative." (*Ibid.*)

The evidence in this case was sufficient to show premeditation and deliberation. First, there was substantial evidence of motive. Appellant had a history of fighting with and being verbally abusive towards his mother. One episode that occurred the month before she died caused her to become so fearful that she left her house and stayed at Noriega's for the night. And not long before that instance, appellant was fighting with Rodriguez and told her he was going to kill her. The day of her death, Rodriguez threw him out of her house, where he had been staying temporarily. Although a reasonable person would not be motivated to kill over an eviction by one's parent, one may infer from the evidence that this was enough in appellant's mind. The evidence showed appellant did not react reasonably when it came to his mother, had been angry enough before to threaten killing her, had acted abusively towards her, and had reason to want to punish her on the day in question.

Second, the manner of killing contributed to substantial evidence of premeditation and deliberation. Rodriguez died of blunt force trauma. Additionally, the medical examiner could not rule out strangulation as a contributing factor in her death. Either way—whether appellant strangled and beat her or only beat her to death—the manner of killing suggests appellant had time to reflect and arrive at a judgment to kill. It is not as

6

though he can claim he fired off a single bullet or stabbed her once in a particularly deadly area, before he had time to think or consider the consequences of his actions. Death by blunt force trauma required multiple strikes or blows administered to the head with significant force. The strangulation occurred with enough force to fracture a bone and cartilage in her neck, and the scratches on her neck indicated she was resisting by attempting to dislodge the hands around her neck. A reasonable juror could infer that appellant's actions were not the result of mistake or uncertainty of purpose, but premeditation and deliberation. (*People v. Shamblin* (2015) 236 Cal.App.4th 1, 11-12 [evidence defendant strangled murder victim for one to five minutes, hit victim over the head several times, and victim tried to fight him off supported reasonable inference that defendant had time to consider consequences of his actions before choosing to end her life, providing substantial evidence of premeditation and deliberation].)

Appellant likens his case to *People v. Boatman* (2013) 221 Cal.App.4th 1253 (*Boatman*), but that case is factually dissimilar. The defendant in *Boatman* shot his girlfriend in the face with a single bullet. (*Id.* at p. 1257.) Although there was some evidence the two had a verbal fight just before the shooting, the defendant (who testified at trial) consistently maintained the shooting was an accident. (*Id.* at pp. 1258-1260.) Immediately after the shooting, a witness heard a commotion "'like someone was panicking . . . or screaming like out of fear'" (*id.* at p. 1259), and the defendant told another witness to call the police (*id.* at p. 1261). He also tried to give the victim mouth-to-mouth resuscitation. (*Ibid.*) In the recording of the 911 call, the jury could hear the defendant "crying and repeatedly saying things like, '[n]oooo,' '[b]aby,' and '[b]aby, are you alive, baby . . . .'" (*Ibid.*) When the police arrived, the defendant ran out of the house and told the police to call an ambulance. (*Id.* at p. 1258.) On the way to the police station, the defendant was crying and asked an officer if he knew whether the victim was okay, and the defendant said, "'I can't lose her. I would do anything for her. How is someone supposed to go on with their life when they see something like that? We were just going to watch a movie.'" (*Id.* at p. 1259.)

7

The *Boatman* court held there was no evidence of planning, little or no evidence of motive, and a shooting that could not be described as "execution style" and so did not support premeditation. (*Boatman, supra*, 221 Cal.App.4th. at pp. 1267-1269.) The court noted the "[d]efendant's behavior following the shooting is of someone horrified and distraught about what he had done, not someone who had just fulfilled a preconceived plan." (*Id.* at p. 1267.) Overall, the evidence was insufficient to support a finding of premeditation and deliberation, and the court reduced the conviction to second degree murder. (*Id.* at p. 1274.) Thus, none of the three *Anderson* factors supported a finding of premeditated murder in *Boatman*, in contrast to this case, in which at least two factors do. Additionally, the behavior of the *Boatman* defendant after the shooting and his insistence that it was an accident stands in stark contrast to appellant's behavior. There was no evidence appellant acted as though the killing was an accident, or that he tried to help his mother afterward. Instead, the evidence showed he calmly walked away from the scene, and Funes discovered Rodriguez's body 20 minutes later when he decided to look for her.

## 2. *Voluntary Manslaughter Instruction*

Appellant contends we must reverse because the court prejudicially erred in withdrawing the voluntary manslaughter instruction from the jury. We disagree.

The court initially instructed the jury on voluntary manslaughter at appellant's request because it believed there was "evidence of provocation." The following day, the court indicated it had reconsidered the issue of voluntary manslaughter and did not believe substantial evidence of provocation existed. The court removed the voluntary manslaughter instruction (CALCRIM No. 570 ["Voluntary Manslaughter: Heat of Passion—Lesser Included Offense"]) from the packet for the jury and told the jury "to disregard any instruction yesterday about manslaughter. [¶] The manslaughter instructions have been removed from the packet. So consideration of manslaughter is not something that you will have to make." In pertinent part, the court instructed the jury on the principles applicable to premeditated murder and second degree murder, including with CALCRIM No. 522 ("Provocation: Effect on Degree of Murder"), which stated: "Provocation may reduce a murder from first degree murder to second degree, and may

8

reduce a murder to manslaughter. The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder."

Voluntary manslaughter is a lesser included offense of murder. (*People v. Thomas* (2012) 53 Cal.4th 771, 813.) "An instruction on a lesser included offense must be given only if there is substantial evidence from which a jury could reasonably conclude that the defendant committed the lesser, uncharged offense but not the greater, charged offense. [Citation.] '*[E]very* lesser included offense, or theory thereof, which is supported by the evidence must be presented to the jury.'" (*Ibid.*) But "the existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense . . . ." (*People v. Breverman* (1998) 19 Cal.4th 142, 162.) Further, bare speculation does not require the giving of an instruction on a lesser offense. (*People v. Wilson* (1992) 3 Cal.4th 926, 941.) "'Substantial evidence is evidence sufficient to "deserve consideration by the jury," that is, evidence that a reasonable jury could find persuasive.'" (*People v. Lewis* (2001) 25 Cal.4th 610, 645.) We apply the independent or de novo standard of review to the court's refusal to instruct on imperfect self-defense. (*People v. Waidla* (2000) 22 Cal.4th 690, 733.)

"Voluntary manslaughter is 'the unlawful killing of a human being without malice' 'upon a sudden quarrel or heat of passion.' (§ 192, subd. (a).) An unlawful killing is voluntary manslaughter only 'if the killer's reason was actually obscured as the result of a strong passion aroused by a "provocation" sufficient to cause an "'ordinary [person] of average disposition . . . to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.'" [Citations.]' [Citation.] 'The provocation must be such that an average, sober person would be so inflamed that he or she would lose reason and judgment. Adequate provocation . . . must be affirmatively demonstrated.'" (*People v. Thomas, supra*, 53 Cal.4th at p. 813.)

Here, we agree with the trial court that there was not substantial evidence justifying the voluntary manslaughter instruction. Appellant contends there was

9

substantial evidence Rodriguez provoked him and he thus killed her under the heat of passion because she was angry at appellant on the day of her killing, she asked him to move out, and the two had a volatile history together. He speculates that they must have argued in the back room where he killed her, and this argument was substantial evidence of provocation that would reduce the killing to voluntary manslaughter. But there is no evidence that appellant and Rodriguez had a heated argument in the room. And even if we assume appellant was under the influence of a "strong passion" at the time of the killing, the provocation must be such that an *average, sober person* would be so inflamed he or she would lose reason and judgment. (*People v. Breverman, supra*, 19 Cal.4th at p. 163.) No reasonable juror would find that telling someone to move out would cause an average, sober person to lose all reason and judgment, and if Rodriguez said something more provocative to appellant than that, there is absolutely no evidence of it.

Moreover, it was not as though Rodriguez sprung the issue on him right then and there. Funes told appellant his mother wanted him out before she came home, at least 30 minutes to an hour before the two went into the back room together. Appellant had time to reflect on the issue and cool off. A heat of passion killing occurs "'suddenly as a response to the provocation, and not belatedly as revenge or punishment.'" (*People v. Daniels* (1991) 52 Cal.3d 815, 868.)

## DISPOSITION

The judgment is affirmed.

FLIER, J.

WE CONCUR:

BIGELOW, P. J.

GRIMES, J.

10