Filed 1/6/22  P. v. Collins CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>  v.<br><br>LATICE COLLINS,<br><br>    Defendant and Appellant. | C093514<br><br>(Super. Ct. No. 10F07391) |

Defendant Latice Collins appeals the trial court's denial of his petition for resentencing under Penal Code section 1170.95.[1]  He contends the trial court erred when it denied his petition using the substantial evidence standard instead of determining the prosecutor proved each element of the murder under the proof beyond a reasonable doubt standard.  We agree and reverse.

---

[1]    Undesignated statutory references are to the Penal Code.

1

FACTUAL AND PROCEDURAL BACKGROUND

On December 5, 2012, defendant pleaded guilty to first degree murder and attempted robbery. (§§ 187, subd. (a), 664, 211.) He also admitted the firearm enhancement allegation that a principal was armed with a firearm during the murder. (§ 12022, subd. (a)(1).) The special circumstance allegation the murder was committed during the commission of an armed robbery was stricken.

A.     *The Plea*

The factual basis for defendant's plea was as follows:

On October 29, 2010, defendant and codefendants Nathaniel Carter and Dejohng Taylor "formulated a plan to rob a victim by the name of Steven Carmassi. The three were aware that Steven Carmassi was parked in a pickup truck up the street in the SaveMart parking lot. [¶] Dejohng Taylor drove Nathaniel Carter and [defendant] up to the SaveMart parking lot, she parked her vehicle behind Mr. Carmassi's truck. [¶] Nathaniel Carter got out of Ms. Taylor's vehicle and went around to the driver's side window of Carmassi's truck. [Defendant] exited Ms. Taylor's vehicle and went around to the passenger side of Mr. Carmassi's truck. When doing so, they had the intent of robbing Mr. Carmassi. [¶] Mr. Carmassi attempted to flee to avoid being robbed. He placed his truck in reverse. He backed up and smashed into Ms. Taylor's vehicle and then drove forward attempting to drive out of the parking lot. During this period he was shot in the left side by Nathaniel Carter, who was armed with a .22 caliber pistol. Mr. Carmassi later died of his injuries."

The trial court sentenced defendant to 25 years to life for first degree murder plus a one-year consecutive term for the firearm enhancement. The court imposed and stayed, pursuant to section 654, an eight-month term for attempted robbery and a consecutive term of one year for the firearm enhancement.

On January 9, 2019, defendant filed a form petition for resentencing under section 1170.95. He alleged he pleaded guilty to first or second degree murder because he believed he could be convicted of those offenses pursuant to the felony-murder rule or the nature and probable consequences doctrine. He checked the box stating he could not now be convicted of murder due to the changes made to sections 188, and 189, effective January 1, 2019. He requested appointment of counsel and checked the boxes stating he was not the actual killer, did not act as an accomplice with the intent to kill, and was not a major participant in the crime or act with deliberate indifference to human life.

The court found defendant established a prima facie showing under section 1170.95 and set the matter for an order to show cause hearing (OSC). At the OSC, the parties submitted the factual basis for his plea, defendant's testimony, the testimony of two independent witnesses, and the transcript from codefendant Carter's jury trial.

B. *Codefendant's Jury Trial*

We summarize the relevant testimony from codefendant Carter's trial:

Carmassi was a marijuana dealer who sold his product in the Keoncrest neighborhood. After having been robbed in the Keoncrest neighborhood, he stopped going there. Carmassi befriended 16-year-old D.H. and she knew him for three months before his murder. K.T.[2] testified she and her friend, D.H., would often obtain marijuana from Carmassi.

On October 29, 2010, K.T. and D.H. decided they wanted some more marijuana. D.H. called Carmassi and made plans to meet at the Save Mart parking lot. Carmassi did not like K.T., so K.T. and D.H. decided to find someone else that could go with D.H.

---

[2]    K.T. was 15 years old at the time of the crime. K.T. testified she had been threatened and feared retaliation for testifying at trial.

3

They ran into defendant, Carter, and Taylor getting out of Taylor's white four-door car. The two men were hyped up and taking bandanas off of their faces saying they had just "hit another lick," which K.T. believed was slang for having committed a robbery. Defendant and Carter approached them and asked D.H. if she would help them rob Carmassi. Defendant and Carter planned how they would commit the robbery and encouraged D.H. to participate. According to K.T., Carter said D.H. should distract Carmassi and he would push her out of the way to rob him. At first, D.H. agreed. D.H. ultimately decided not to participate.

D.H.'s[3] testimony was generally consistent with K.T.'s. She testified when defendant, Carter, and Taylor drove up, Carter and defendant got out of the car and called her over to them. Carter said they were going to "hit an ugly," which meant committing a robbery. Either Carter or defendant said the victim would be Carmassi. According to D.H., K.T. immediately agreed to help them, saying, "Fuck it. Let's do it," while D.H. said no. Both men pressured D.H. to participate, but defendant was the one that applied the most pressure. D.H. and K.T. agreed to join.

When the plan was set, defendant, Carter, and Taylor got into Taylor's car and drove to the Save Mart. For her part, D.H. testified she was going to call Carmassi to warn him, but decided against it. Instead, she walked over to the Save Mart to warn him.

K.T. watched the murder in the Save Mart parking lot from a distance. She saw Carmassi's white pickup truck parked in the lot. Both K.T. and D.H. saw Taylor's car turn into the parking lot and park behind Carmassi's car. Defendant and Carter got out of the car and ran up to the truck's windows. Defendant approached on the passenger side; Carter approached on the driver's side. Although it was dark outside and she was far

---

[3] D.H. testified she had been threatened and feared retaliation for providing testimony at trial. She provided her testimony at trial pursuant to a plea deal under which she would be charged with being an accessory after the fact and sentenced to time served.

away from Carmassi's truck, K.T. testified defendant and Carter each had a gun in his hand. D.H. did not see any guns, but saw Carter motion as if he pulled a gun out of his waist.

Both men put their hands inside the windows of the truck. D.H. screamed out Carmassi's name to warn him. K.T. saw Carter and Carmassi struggle at the driver's window and heard Carter demand everything Carmassi had. D.H. stated she could not really see what defendant and Carter did after they ran up to the truck due to her vantage point.

Carmassi put the truck in reverse and crashed into the front of Taylor's car. K.T. testified she heard two gunshots while D.H. testified she heard one or two gunshots. After he backed up, Carmassi drove onto the main road.

K.T. saw defendant throw his gun in Taylor's car. Defendant then ran away towards some neighboring apartments. Both K.T. and D.H. saw Carter get back into Taylor's car and the two drove back to Keoncrest.

Officers responded almost immediately. The responding deputy found the victim with a gunshot wound. Carmassi died from that wound.

D.H. testified Carter's gun was a single-shot pistol that could only fire one bullet at a time without being reloaded. D.H. also testified she had often seen defendant with a revolver, but she did not see one the night of the murder. In her prior statement to the detectives, however, she said defendant's gun was a semiautomatic pistol.

In the prior statement D.H. gave to detectives, she told the detective defendant is the one who told her to walk up to Carmassi and distract him so they could rob him. She also told the detective she did not see a gun, but rather heard a gunshot and saw a puff of smoke in the air. She saw Carter with one of the guns involved in the incident at a later time. D.H. said she saw defendant with a gun as well.

K.T. told detectives she was across the street and she "couldn't really see what they did."

5

C.       *Evidence at the OSC Hearing*

At the OSC hearing, the People called D.H. as a witness. She did not remember the most basic of the facts of the night of the murder. She claimed she had no knowledge Carmassi sold marijuana in her community. She did not remember warning Carmassi people were going to rob him. At first, she did not remember calling Carmassi for more marijuana. She also did not recall calling Carmassi the day he was murdered, but then recalled calling him, but did not know why. She next conceded she called Carmassi for marijuana and he agreed to provide her with some because that is what he would do, but she had no recollection of this particular call. D.H. could not identify defendant in the courtroom. She did not remember defendant and Carter planned the robbery. She did not remember seeing defendant and Carter getting out of their car to approach Carmassi. She did not remember a conversation where she agreed to distract Carmassi or she decided to warn Carmassi of the robbery plot. She did remember, however, calling out to Carmassi and hearing a gun go off, but could not remember how many gunshots she heard. She did not remember seeing a gun that night. D.H., however, affirmed the testimony she gave in Carter's trial was truthful even though she did not remember the facts now, 10 years later. Similarly, she affirmed the information she provided to the police in her statement was truthful.

The prosecution also called K.T. to testify. She testified D.H. called Carmassi and asked for marijuana. He agreed to provide it, but he would not come to her. She confirmed her prior testimony defendant and Carter got out of their car in an excited state when they first met. She testified D.H., defendant, and Carter all decided to rob Carmassi. After the plan was set, K.T. and D.H. decided to warn Carmassi about the plot and D.H. began walking to the Save Mart to do so. Defendant and Carter drove to the Save Mart and parked behind Carmassi. At first, K.T. did not remember whether the men were armed when they got out of their car, but she did hear a gunshot. After reviewing

6

her trial testimony, K.T. stated both men had guns in their hands and put their hands inside Carmassi's truck. K.T. did not remember seeing either man with a gun prior to the murder. She did remember a gun being thrown somewhere, but did not remember if it was defendant's. K.T. also confirmed her trial testimony was truthful.

On cross-examination, defendant's counsel asked K.T. about her prior testimony that she did not see any guns after they returned from the first robbery, but she was pretty sure they were armed.[4] She also said she could not tell if the passenger side window was up or down because she could not see the passenger side of the truck. At the time of the OSC hearing, K.T. did not remember seeing any guns, but confirmed that her prior trial testimony was fresher and she told the truth at the trial.

Defendant testified on his own behalf. He claimed he did not participate in another robbery prior to arriving at Keoncrest. He claimed a "lick" was slang for a robbery, but it could also mean any number of things that did not include a robbery. He said he was not armed the night of the robbery and never owned a pistol of any kind. He stated, the night of the robbery, he and Taylor picked up Carter on their way to Keoncrest. During their car ride, the men talked about committing a robbery to get marijuana. Defendant claimed it was Carter's idea to steal the marijuana. When they met with K.T. and D.H., D.H. is the one who told them Carmassi had marijuana at the Save Mart. D.H. also told them that Carmassi had been robbed before and as a result, defendant did not believe he would resist. He said all of the parties planned the robbery. Defendant admitted Carter had a gun, but he did not know that until after Carter used it. Defendant's role in the plan was to snatch the marijuana and run away.

When they got to the Save Mart parking lot, defendant went to the passenger side of Carmassi's truck and Carter ran up to the driver's side. Defendant said he thought the

---

**4**      The objection to this testimony as speculative was sustained in Carter's trial.

7

crime was just supposed to be a snatch and grab. Defendant said he shouted at Carter, "What the fuck are you doing?" because things were not going according to plan. Carter told Carmassi to give him all his "shit" and immediately shot Carmassi. Defendant claims the window on his side of the truck was up, so he could not stick his hands inside the truck. After the shooting, defendant ran away.

Defendant agreed robbing a drug dealer was dangerous, but he did not believe someone would die in the Carmassi robbery because he had been robbed before and gave up the marijuana. He also admitted armed robbery was dangerous and someone could get killed in an armed robbery.

Defendant admitted to telling a number of lies to the police about the murder. He lied about not being at the murder to avoid being held responsible for the robbery. He lied that he did not know if Carter was involved or that Carter shot Carmassi. Defendant also lied that he did not see Carmassi get shot.

D.    *Trial Court Ruling*

After the submission of the evidence and briefing, the trial court denied the petition in a 19-page written order. The trial court recited the factual basis for the plea, the live testimony of K.T, D.H., and defendant, the transcripts of defendant's interrogations with the officers, and the relevant evidence adduced at the Carter trial. Despite the stipulation of the parties the court could consider the Carter trial testimony in its entirety without objection, the court limited its consideration to the prior testimony of K.T. and D.H. to the extent the statements they made during the prior trial were either prior consistent or inconsistent statements.

The court noted that in the factual basis for the plea, there was no statement defendant was personally armed with or used a firearm during the robbery. The trial court next summarized the live testimony of D.H. and K.T. and defendant. The court

8

found D.H was purposely evasive and K.T. was credible and her testimony at the evidentiary hearing was consistent with her testimony at the Carter trial.

As to defendant and his statements to the police, the court noted defendant consistently stated he was not armed and he did not know Carter was armed. The police interrogation testimony demonstrated defendant had ample opportunities to tell the truth, but instead, he feigned ignorance and lied through the majority of the interrogations. The trial court found defendant's credibility was "suspect and . . . fatally inconsistent with credible, independent testimony presented at the evidentiary hearing and parts of co-defendant's jury trial, and the agreed-upon factual basis given at the time of his plea."

In examining the case, the trial court zeroed in on the relevant question to be decided in this case: Was defendant a major participant in the underlying felony and did he act with reckless indifference to human life. (§ 189, subd. (e).) The court carefully examined each of the factors identified in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*) to answer this question.

Reviewing the *Banks* factors as to whether defendant was a major participant, the court noted there was evidence defendant helped plan the robbery, defendant had a gun and used it during the robbery, defendant was aware of the dangerousness of his conduct, was present during the killing, defendant fled the scene after shooting, and defendant did not help the victim. Based on this evidence, the trial court found "it appears that the evidence is sufficient for a jury to conclude, beyond a reasonable doubt, that defendant . . . was a major participant in the underlying felony.

On the question of reckless indifference under *Clark*, the court noted there was evidence defendant used a firearm and placed it inside the truck during the robbery, defendant was present at the scene and fled after the shooting, the robbery was conducted in such a way as to involve the risk of an interloper happening upon the scene, and defendant did not attempt to minimize the risk of the robbery. The trial court found there was evidence on two of the *Clark* factors that tended to demonstrate defendant did not act

9

with reckless indifference: the robbery was quick and unsophisticated thus not involving prolonged restraint, and there was no evidence presented defendant had any knowledge codefendant was likely to kill. Again, the court found "it appears the evidence is sufficient for a jury to conclude, beyond a reasonable doubt, that defendant . . ., in committing the underlying felony, acted with reckless indifference to human life."

The court identified the diverging lines of cases on the prosecution's burden of proof on this ultimate question. On the one hand, *People v. Lopez* (2020) 56 Cal.App.5th 936, review granted February 10, 2021, S265974 (*Lopez*), requires the prosecutor to prove, beyond a reasonable doubt, each element of the murder charge under current law. On the other hand, *People v. Duke* (2020) 55 Cal.App.5th 113, review granted January 13, 2021, S265309 (*Duke*), requires the prosecutor to show on the entire record, whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt. According to the trial court, the *Duke* standard is "essentially identical to the standard of substantial evidence, in which the reviewing court asks whether, on the entire record, a rational trier of fact *could* find the defendant guilty beyond a reasonable doubt." (Italics added.) The trial court adopted the *Duke* standard and rejected *Lopez,* and found defendant was "a person who still could be convicted of guilty of murder, beyond a reasonable doubt, in the wake of [Senate Bill No.] 1437."

## DISCUSSION

Defendant contends the trial court erred in applying an incorrect burden of proof under section 1170.95, subdivision (d)(3) when evaluating his claim. We agree.

A.     *Senate Bill No. 1437*

Senate Bill No. 1437, which took effect on January 1, 2019, limited accomplice liability under the felony-murder rule and eliminated the natural and probable consequences doctrine as it relates to murder, to ensure that a person's sentence is commensurate with his or her individual criminal culpability. (*People v. Gentile* (2020)

10

10 Cal.5th 830, 842-844.) Prior to the passage of Senate Bill No. 1437, under the natural and probable consequences doctrine, a defendant was "liable for murder if he or she aided and abetted the commission of a criminal act (a target offense), and a principal in the target offense, committed murder (a nontarget offense) that, even if unintended, was a natural and probable consequence of the target offense." (*People v. Lamoureux* (2019) 42 Cal.App.5th 241, 248; *People v. Munoz* (2019) 39 Cal.App.5th 738, 749, review granted Nov. 26, 2019, S258234.) Senate Bill No. 1437 amended sections 188 and 189.

Section 188, which defines malice, now provides, in part: "Except as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3).) Section 189, subdivision (e) now limits the circumstances under which a person may be convicted of felony murder: "A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) [(defining first degree murder)] in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2."

Senate Bill No. 1437 also added section 1170.95. This section allows those "convicted of felony murder or murder under a natural and probable consequences theory [to] file a petition with the court that sentenced the petitioner to have the petitioner's murder conviction vacated and to be resentenced on any remaining counts when all of the following conditions apply: [¶] (1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine. [¶] (2) The

11

petitioner was convicted of first degree or second degree murder following a trial . . . . [¶] (3) The petitioner could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1170.95, subd. (a).)

Once a complete petition is filed, "[t]he court shall review the petition and determine if the petitioner has made a prima facie showing that the petitioner falls within the provisions of this section. If the petitioner has requested counsel, the court shall appoint counsel to represent the petitioner. The prosecutor shall file and serve a response within 60 days of service of the petition and the petitioner may file and serve a reply within 30 days after the prosecutor response is served. . . . If the petitioner makes a prima facie showing that he or she is entitled to relief, the court shall issue an order to show cause." (§ 1170.95, subd. (c).)

Here, the trial court determined the prima facie showing was made and issued the OSC. The court then conducted the required hearing. (§ 1170.95, subds. (c), (d); *People v. Nguyen* (2020) 53 Cal.App.5th 1154, 1165-1166.) The parties agreed it was necessary for the prosecution to prove, beyond a reasonable doubt, the petitioner was ineligible for resentencing. (§ 1170.95, subd. (d)(3).) They differed on what burden of proof that standard requires.

B. *Burden of Proof*

Defendant contends the prosecution was required to establish guilt beyond a reasonable doubt under the new statutes; that is, the court must find beyond a reasonable doubt defendant actually acted with the now-required mental state. (See *Lopez*, *supra*, 56 Cal.App.5th 936, 951, review granted; *People v. Rodriguez* (2020) 58 Cal.App.5th 227, 238-239, review granted Mar. 10, 2021, S266652 (*Rodriguez*).) By contrast, the prosecutor argued it was required to prove only defendant "could still have been convicted of murder under the new law—in other words, that a reasonable jury could find the defendant guilty of murder with the requisite mental state for that degree of murder.

12

This is essentially identical to the standard of substantial evidence, in which the reviewing court asks ' "whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. . . .  [¶]  . . ." [Citation.]' " (Italics omitted.) (See *People v. Duke*, *supra*, 55 Cal.App.5th at p. 123, review granted.)  The trial court agreed with the prosecutor.

On appeal, the Attorney General analyzes both lines of cases noted above and concludes the better approach is set forth in the *Lopez/Rodriguez* line of cases because it is based on a practical reading of the statute.  We agree with the parties the prosecution must establish guilt beyond a reasonable doubt under the new statutes; that is, the trial court must find beyond a reasonable doubt defendant actually acted with the now-required mental state, as opposed to merely a jury could have so found.  (*Lopez, supra,* 56 Cal.App.5th at p. 951; *Rodriguez, supra,* 58 Cal.App.5th at pp. 238-239, review granted.)

Thus, it is undisputed the trial court erred in using the incorrect evidentiary standard.

C.      *Harmless Error*

The Attorney General argues this error is harmless under *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).  In the Attorney General's view, there is overwhelming evidence the trial court would have denied appellant's petition under the proper standard of proof.  Defendant responds the appropriate standard is an automatic reversal because the error stripped defendant of his basic rights.  While we agree with the Attorney General this error is subject to harmless error review, we cannot conclude the error was harmless.

The requirement the prosecution must prove beyond a reasonable doubt the petitioner is ineligible under section 1170.95 is statutory.  Any error by the trial court regarding the standard of proof did not violate defendant's federal constitutional right to

due process.  (See *Lopez*, *supra*, 56 Cal.App.5th at p. 958 [the " 'proceedings authorized by [section 1170.95] are not constitutionally compelled' "], review granted.)  Because any error committed by the trial court in applying the wrong legal standard implicated state law only, we must decide under *Watson* whether it is reasonably probable defendant would have achieved a more favorable result had the court applied the correct standard.  (See *People v. Epps* (2001) 25 Cal.4th 19, 29 ["the *Watson* test for harmless error applies" to the denial of a right that "is purely a creature of state statutory law"]; *People v. Johnson* (2016) 1 Cal.App.5th 953, 968 [applying the *Watson* test to conclude the trial court's error in restricting the type of evidence a petitioner may use to establish eligibility for resentencing under Proposition 47 was harmless].)

We start by examining the relevant question at issue here:  Was defendant a major participant in the underlying felony who acted with reckless disregard for human life?

As correctly noted by the trial court, the California Supreme Court provided a nonexclusive list of factors to assist in making the determination whether a defendant was a "major participant" in a felony murder, namely—"What role did the defendant have in planning the criminal enterprise that led to one or more deaths?  What role did the defendant have in supplying or using lethal weapons?  What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants?  Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death?  What did the defendant do after lethal force was used?"  (*Banks*, *supra*, 61 Cal.4th at p. 803, fn. omitted.)

Similarly, the trial court here properly examined another set of factors to be considered to ascertain whether a participant in a crime acted with reckless indifference as identified by *Clark, supra*, 63 Cal.4th at pages 615-623.  These factors include:  the defendant's knowledge of weapons and the use and number of weapons in the crime; the defendant's presence at the crime and opportunities to restrain the crime and/or aid the

14

victim; the duration of the felony; the defendant's knowledge of the cohort's likelihood of killing, and the defendants efforts to minimize the risk of violence during the felony. (*Clark*, at pp. 618-622.)

Both of these tests necessarily require the trial court to find the facts and draw inferences from the evidence before it. (*Banks, supra*, 61 Cal.4th at p. 803; *Clark, supra,* 63 Cal.4th at p. 618.) "No one of these considerations is necessary, nor is any one of them necessarily sufficient." (*Banks,* at p. 803; *Clark*, at p. 618.)

The role of an appellate court is different from the trial judge's role in deciding the petition. The trial court sits as the trier of fact and its "responsibility of the trier of fact" is to "fairly . . . resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. (*People v. Boatman* (2013) 221 Cal.App.4th 1253, 1262.) When testimony is provided, it is "the trial judge's function to evaluate the testimony and to determine the credibility of the witnesses." (*People v. Leigh* (1985) 168 Cal.App.3d 217, 221.) "[T]he factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." (*People v. Boatman*, *supra*, 221 Cal.App.4th at p. 1262, original italics.) That is why we, as an appellate court, review the trial judge's factfinding for substantial evidence to support those findings. (*People v. Gregerson* (2011) 202 Cal.App.4th 306, 320.) While the trial judge is charged with reviewing all the relevant evidence, evaluating and resolving contradictions, and making determinations as to credibility, all under the reasonable doubt standard, our role is not to perform a reiteration of the trial court's work, but instead we are charged with determining whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt.

Here, the trial court heard and saw defendant testify. In addition, the trial court saw and heard the other the testimony of the two main witnesses to the planning and

15

execution of the murder, D.H. and K.T. It also examined the other evidence contained in the record in light of this testimonial evidence. Based on this evidence, the trial court carefully analyzed each of the *Banks/Clark* factors and found there was some evidence that would support a jury's determination of guilt on the two ultimate conclusions on the relevant factors. Based on this analysis and the *Duke, supra,* 55 Cal.App.5th 113 appellate review standard, the court found the evidence was "sufficient for a jury to conclude, beyond a reasonable doubt, that defendant" "was a major participant in the underlying felony" and "in committing the underlying felony, acted with reckless indifference to human life."

At the same time, the trial court explicitly rejected the application of the reasonable doubt standard set forth in *Lopez, supra*, 56 Cal.App.5th 936. As a result, the court stopped short of making the finding it was convinced beyond a reasonable doubt defendant was a major participant in the felony and acted with reckless indifference. The trial court's decision not to make findings based on the higher standard when it knew competing standards existed and cases on both sides of the question were on review by our Supreme Court suggests a reasonable probability the trial court may not have been willing to make the required finding on the record before it.

In addition, the record contains evidence that may or may not have tilted the trial court against finding the prosecution proved its case beyond a reasonable doubt had it applied that higher standard of review. For example, the trial court noted the factual basis for the plea did not state defendant was personally armed or used a firearm in the crime. The trial court noted the underlying crime was a quick, fairly unsophisticated robbery. The trial court highlighted defendant's consistent proclamation of his lack of knowledge his codefendant had a gun and there was no evidence defendant knew his codefendant was likely to kill. Evidence supported the contention Carter deviated from the plan and shot Carmassi in a spontaneous or accidental manner.

16

The problem with trying to apply a harmless error argument here is that it requires us to make factual findings in the first instance based upon the contradictory testimony of live witnesses who were both credible and not credible on a multitude of disputed facts. This court has not seen or heard those witnesses. As part of its proper role as the finder of fact here, the trial court remains in the best position to weigh the live testimony and other evidence against the required standard of proof beyond a reasonable doubt.

Given the lack of a finding the weight of the evidence met the reasonable doubt standard, the conflicting testimonial evidence presented on defendant's conduct, knowledge, and actions, we cannot conclude the trial court's error in applying the lower standard of proof was harmless. In so finding, however, we express no opinion as to whether the evidence here met or did not meet the correct standard. We reverse the matter in order for the trial court to determine, in the first instance whether the prosecutor met the burden of proving beyond a reasonable doubt that defendant is guilty of murder on a theory of murder valid under the current law. (See *Rodriguez, supra*, 58 Cal.App.5th at p. 245 [trial court, as factfinder, should decide a § 1170.95 petition in the first instance using the proper standard of proof], review granted.)

## DISPOSITION

The order denying defendant's petition for resentencing is reversed and the case is remanded for the trial court to conduct a new hearing under section 1170.95, subdivision (d)(3) as described by this opinion.

\s\
BLEASE, Acting P. J.

We concur:

\s\
ROBIE, J.

\s\
MAURO, J.

17