Filed 3/6/23  P. v. Delci CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B315269 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. VA136663) |
| v. | |
| ANTHONY MICHAEL DELCI, | |
| Defendant and Appellant. | |

APPEAL from the judgment of the Superior Court of Los Angeles County.  Raul A. Sahagun, Judge.  Affirmed.

Elizabeth K. Horowitz, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorneys General, Susan Sullivan Pithey, Assistant Attorney General, Davie E. Madeo, William H. Shin and Christopher Sanchez, Deputy Attorneys General, for Plaintiff and Respondent.

* * * * * * * * * *

Defendant and appellant Anthony Michael Delci appeals from the denial of his petition for resentencing pursuant to Penal Code section 1172.6 (former § 1170.95). Defendant challenges the court's finding there was substantial, credible evidence supporting his guilt of second degree murder as a direct aider and abettor. During the pendency of this appeal, former section 1170.95 was renumbered and recodified as section 1172.6 with no change in the text. (Stats. 2022, ch. 58, § 10.) For clarity, we refer to former section 1170.95 only by its new designation (§ 1172.6).

Defendant also filed a petition for habeas corpus on the ground his retained counsel provided ineffective assistance in representing him at the evidentiary hearing.

We affirm the denial of defendant's petition for resentencing, deny defendant's motion to consolidate and resolve defendant's habeas petition by separate order (No. B321013) filed concurrently with this opinion.

**PROCEDURAL BACKGROUND**

Defendant and his accomplice, Victor Arzate, both members of the Pico Nuevo gang, were charged with one count of murder arising from the fatal shooting of Jonathan R. in 2014. (Pen. Code, § 187, subd. (a); count 2.) Defendant was also charged with one count of possession of a firearm by a felon (§ 29800, subd. (a)(1); count 1), as was Arzate (count 3). All the offenses were alleged to be gang related within the meaning of section 186.22. Just before the start of jury selection, defendant pled guilty to the firearm possession charge and admitted the gang allegation as to that count only. It was alleged that a principal personally and intentionally used and discharged a firearm in the commission of the murder within the meaning of

2

section 12022.53, subdivisions (b) through (e)(1). Personal firearm use allegations were alleged as to Arzate. Defendant was also alleged to have suffered a prior serious or violent felony within the meaning of the "Three Strikes" law and section 667, subdivision (a)(1).

In 2017, defendant and Arzate were tried jointly with separate juries before Judge Raul A. Sahagun. The jury found defendant guilty of second degree murder, acquitted him of first degree murder and found not true all of the principal firearm use allegations. Arzate's jury convicted him of first degree murder and found true the personal firearm use allegations.

Defendant requested a new trial on the grounds of new evidence. Defense counsel attested he had been contacted after trial by a Whittier Varrio Locos gang member who told him that Arzate had been dating Yvette G., the sister of the murder victim, but the relationship ended a few weeks before the shooting. No declaration from the gang member was presented. The court allowed Yvette to testify at the hearing on the motion. Yvette confirmed she had gone out with Arzate a few times but broke it off with him a couple of weeks before her brother was shot. She did not say the relationship ended badly or in a manner that would make Arzate come back to target her brother with violence. Yvette denied being friends with defendant or knowing G.E., a witness to the crimes. The court denied defendant's motion.

At the original sentencing hearing, the court granted defendant's motion to strike his strike prior. The court found the prior conviction true for purposes of the five-year enhancement. The court sentenced defendant to state prison for a term of 30 years to life (15 years to life on the murder, plus a consecutive

3

10-year term for the gang enhancement and a consecutive five-year term for the prior felony enhancement; and a concurrent term of seven years on the possession count).

In November 2019, we affirmed defendant's conviction and remanded for a new sentencing hearing in light of the passage of Senate Bill 1393 while that appeal was pending. (*People v. Delci* (Nov. 27, 2019, B292466) [nonpub. opn.].) We directed the court on remand to strike the 10-year gang enhancement and to award defendant two additional days of presentence custody credits. In a separate opinion, we affirmed Arzate's conviction. (*People v. Arzate* (Feb. 27, 2019, B286532) [nonpub. opn.].) Arzate is not a party to this appeal.

The Legislature also passed Senate Bill 1437 (2017–2018 Reg. Sess.) while defendant's direct appeal was pending, amending Penal Code sections 188 and 189 to narrow accomplice liability for felony murder and eliminating the natural and probable consequences doctrine as it relates to murder. (Stats. 2018, ch. 1015, § 2, § 3.) Senate Bill 1437 also added section 1172.6 which set forth a procedure for individuals convicted of felony murder or murder under a natural and probable consequences theory to petition for resentencing. (Stats. 2018, ch. 1015, § 4.)

Defendant filed, in propria persona, a petition for resentencing pursuant to section 1172.6. Judge Raul A. Sahagun, the same judge that had presided over the trial, denied the petition without prejudice, finding it premature in light of the new sentencing hearing that had been scheduled following remand from this court.

Defendant was resentenced on October 27, 2020. The court imposed a sentence of 20 years to life (15 years to life on the

4

murder count, plus a consecutive five-year felony enhancement and a concurrent seven-year term on the possession count).

Defendant then filed, in propria persona, a new form petition for resentencing alleging he was convicted of second degree murder under the natural and probable consequences doctrine, and he could not be convicted of murder under current law as amended by Senate Bill 1437. Defendant substituted retained counsel who filed an amended petition on his behalf. The amended petition included, among other things, a copy of the verdict form for the murder charge and the natural and probable consequence instruction given to the jury.

The People filed a response. Judge Sahagun found defendant stated a prima facie case for relief and issued an order to show cause.

The evidentiary hearing pursuant to section 1172.6, subdivision (d)(3) was held September 21, 2021. Defendant was represented by counsel and appeared via Webex. Neither side presented new evidence, relying instead on the evidence presented at the 2017 trial. After entertaining argument, Judge Sahagun denied defendant's petition, finding sufficient evidence to establish defendant's guilt, beyond a reasonable doubt, of second degree murder as a direct aider and abettor.

This appeal followed. We grant defendant's request to take judicial notice of the record in the direct appeal (No. B292466). Defendant also filed a petition for habeas corpus alleging ineffective assistance of counsel (No. B321013).

**FACTUAL SUMMARY**

We draw our facts from our opinion in *Delci*, *supra* summarizing the trial testimony. For privacy reasons, we refer to the witnesses and the victim by their first names only, and to

witness G.E. by his initials because he was a minor at the time of the shooting and when he testified at trial.

On the afternoon of August 30, 2014, Joann R. was at her home near La Cuarta Avenue and Washington Street in the city of Whittier. Her adult son, Jonathan, one of her adult daughters, Maria G., and several other family members were also there. Maria, who had been on the front porch with Jonathan, came inside and told her mother not to go outside because a white car had driven by and someone in the car had been "throwing" gang signs. (*Delci*, *supra*, B292466.)

A few minutes later, Joann and Jonathan went out into the front yard to collect some things that had been left outside. Joann saw a man (who she later identified as Arzate) standing in the street in front of her house. Arzate yelled at Jonathan "where you from?" Joann understood this to be gang talk. Jonathan yelled back that he was "from nowhere," to indicate he had no gang affiliation. (*Delci*, *supra*, B292466.)

Looking through a window from inside the house, Maria saw that the white car had returned and one of the passengers was out in the street. She could hear her brother saying he was "from nowhere." (*Delci*, *supra*, B292466.)

Arzate kept yelling at Jonathan, so Joann said "he's from nowhere. What do you want?" By that point, Jonathan had stepped out to the gate which was open to the sidewalk. Joann noticed that Arzate was holding a "shiny" handgun. She yelled at her son the man had a gun and Jonathan told her to run. Joann turned and headed toward the backyard. From the window, Maria saw her brother turn around as if to come back inside the house. At that point, Arzate started shooting. (*Delci*, *supra*, B292466.)

Joann heard a gunshot and Jonathan yelling. When she turned back toward her son, she heard another shot and saw Jonathan fall onto his knees, clutching at the gate. She heard a total of four gunshots. Joann screamed for her daughter as she tried to help her son. Maria and her boyfriend ran outside, and someone called 911. (*Delci*, *supra*, B292466.)

Juan G. and his wife happened to be driving down La Cuarta that afternoon and saw part of the incident. Juan saw two men in the street who appeared to be in a "heated" conversation. He could not hear what they were saying, but they were about four feet apart from one another and he could see they were yelling at each other. One of the men was wearing black shorts, a black tank top and a baseball cap and was holding a "shiny silver" revolver down at his side. Juan tried to drive around them and make a left turn onto an alley, but a white Honda CRV was blocking the way, so he made a right turn instead. Almost immediately he heard four gunshots. When he looked in his rearview mirror, he could see the Honda still in the alley facing the street. The man in the black shorts ran to the white Honda and jumped into the front passenger seat, and the Honda sped off. (*Delci*, *supra*, B292466.)

Juan drove around the block and saw the Honda again, stuck in traffic, which gave him time to write down the license plate number. He waited for officers to arrive on the scene and gave them the information. Juan did not get a good look at the faces of the men involved in the argument, so he was unable to identify anyone. (*Delci*, *supra*, B292466.)

Jonathan was transported to the hospital where he was pronounced dead. His cause of death was multiple gunshot wounds. (*Delci*, *supra*, B292466.)

Based on the license plate information provided by Juan, the police were able to identify defendant as the owner of the car. Around 10:00 that same night, defendant was located driving the Honda, and police pulled him over. He made gestures with his hands consistent with known gang signs before getting out of the vehicle and being detained. A search of his car resulted in the discovery of a stainless steel revolver with a "speed loader" hidden inside a door panel. Subsequent ballistics testing matched the revolver to the bullets recovered from Jonathan's body during the autopsy. (*Delci*, *supra*, B292466.)

Arzate was subsequently arrested on an unrelated robbery charge. (*Delci*, *supra*, B292466.)

G.E., who was 14 years old, was identified as someone who had been with defendant and Arzate during the shooting. G.E. testified that on the night before the shooting, he had been jumped into the Pico Nuevo gang by defendant, whose moniker was Toker, and Arzate, whose moniker was Suspect. The next day, August 30, 2014, G.E. was with defendant and Arzate driving around in defendant's white Honda CRV. Defendant was driving, Arzate was in the front passenger seat, and G.E. was in the back seat. Around noon, they arrived in Whittier. (*Delci*, *supra*, B292466.)

When they pulled up to the intersection of La Cuarta Avenue and Washington Street, G.E. saw some people standing outside a house on the corner. G.E. thought they might be gang members because they had a lot of tattoos. G.E. "threw a gang sign" out the window—a "P" for Pico Nuevo. Defendant drove around the block and then came back to that same intersection. One of the men with tattoos was still standing outside the home near some trash cans. Defendant stopped the Honda and backed

8

into an alley with the front of the car facing the street. Arzate grabbed a silver handgun and got out of the car. Arzate had the same gun with him the night before when he and defendant jumped G.E. into the gang. After Arzate got out of the car, G.E. asked defendant what was going on. Defendant said, "who knows" and told G.E. to calm down and just be cool. Arzate walked toward the other man who was now standing at the open gate. (*Delci*, *supra*, B292466.)

G.E. saw Arzate holding the gun in his hand, with his arm down at his side. Arzate and the other man started "banging on each other," meaning they were saying, "*Ese*, where you from?" G.E. then heard at least three gunshots and saw the other man fall to the ground near the gate. He noticed for the first time there was an older woman in the yard, and she put her hands up to her face. G.E. was shocked and "frozen" in the back seat. Arzate ran back to the Honda, jumped into the front passenger seat and exclaimed, "I got him." Defendant asked Arzate "where was he from?" Arzate said he was "VNE" (Varrio Nueva Estrada). They then fled the scene. (*Delci*, *supra*, B292466.)

The audio recording of the pretrial interview of G.E. was played for the jury. G.E. initially denied being with defendant and Arzate on the day of the shooting, but eventually admitted they had been driving around together. G.E. denied being the shooter and said he was drunk. He said Arzate told him to throw the gang sign at the men in the yard. G.E. also said defendant told Arzate not to do anything, and that after Arzate jumped out of the car, defendant told G.E. nothing was going to happen, that Arzate knew the guy or something. During his trial testimony, G.E. could not recall defendant making these statements and only remembered defendant asking Arzate where the guy was

9

from. G.E. also testified that Whittier Varrio Locos was a gang allied with Pico Nuevo and not a rival gang. (*Delci*, *supra*, B292466.)

During her testimony describing the shooting, Maria repeatedly denied her brother Jonathan was a gang member but admitted one of her other brothers was a member of the Whittier Varrio Locos gang. (*Delci*, *supra*, B292466.)

The prosecution presented the testimony of an expert on the Pico Nuevo gang. (*Delci*, *supra*, B292466.)

Defendant exercised his right not to testify. Defendant presented the testimony of a gang expert who, among other things, testified the Pico Nuevo gang was allied with, and not a rival of, Whittier Varrio Locos in 2014 when the shooting occurred. He conceded defendant was a Pico Nuevo gang member. (*Delci*, *supra*, B292466.)

## DISCUSSION

### 1. Standard of Review

We review for substantial evidence a trial court's factual findings at an evidentiary hearing pursuant to section 1172.6, subdivision (d)(3). (*People v. Henley* (2022) 85 Cal.App.5th 1003, 1017; *People v. Mitchell* (2022) 81 Cal.App.5th 575, 591 (*Mitchell*); *People v. Ramirez* (2021) 71 Cal.App.5th 970, 985.) In conducting this review, "we presume in support of the judgment the existence of every fact that can be reasonably deduced from the evidence, whether direct or circumstantial." (*Mitchell,* at p. 591; accord, *People v. Brooks* (2017) 3 Cal.5th 1, 57.)

We reject defendant's suggestion that independent review of the court's factual findings is appropriate here because no new evidence was presented at the evidentiary hearing. Defendant says in such circumstances the question presented at the hearing

10

is predominantly legal as the court is tasked with assessing whether the established facts in a "cold record" are sufficient to support a finding of guilt under the amended murder statutes.

In so arguing, defendant relies on *People v. Vivar* (2021) 11 Cal.5th 510 which held that independent review was appropriate in the context of a motion to vacate a conviction pursuant to Penal Code section 1473.7 based solely on declarations. But in so holding, *Vivar* expressly cautioned against extending its rationale beyond section 1473.7. (*Vivar,* at p. 528, fn. 7 ["Nothing we say here disturbs a familiar postulate: when reviewing a ruling under the substantial evidence standard, 'an appellate court should defer to the factual determinations made by the trial court,' regardless of 'whether the trial court's ruling[s are based] on oral testimony or declarations.' "]; see also *Mitchell, supra*, 81 Cal.App.5th at p. 591 [discussing *Vivar* and rejecting de novo review of factual findings made at a § 1172.6 evidentiary hearing].)

## 2. Substantial Evidence Supports the Court's Factual Finding that Defendant Is Guilty as a Direct Aider and Abettor.

Defendant contends the jury's acquittal on first degree murder and the not true findings on the principal firearm use allegations preclude him being found guilty as a direct aider and abettor with the intent to kill, and the court erred in failing to give those jury findings preclusive effect. Defendant relies on the doctrine of collateral estoppel, or alternatively, the reasoning in *People v. Cooper* (2022) 77 Cal.App.5th 393 (*Cooper*) in so arguing.

At an evidentiary hearing pursuant to section 1172.6, subdivision (d)(3), the trial court sits as an independent

11

factfinder and considers the evidence of the defendant's guilt anew, including any new evidence the parties may offer, in order to determine whether the defendant is guilty under current law. The court may also consider new theories of liability not presented at trial. (*People v. Duchine* (2021) 60 Cal.App.5th 798, 813 [the Legislature "plainly intended" that new theories of murder liability could be considered]; accord, *People v. Schell* (2022) 84 Cal.App.5th 437, 444–445.)

The acquittal on first degree murder does not mean the jury necessarily found defendant did not act with the intent to kill. It means the jury concluded defendant did not act with the requisite premeditation and deliberation. Intent to kill and premeditation are not synonymous. (See, e.g., *People v. Boatman* (2013) 221 Cal.App.4th 1253, 1264 [" 'the mere intent to kill is not the equivalent of a deliberate and premeditated intent to kill' "].) The court was free to consider the evidence anew and determine if it established that defendant acted with the requisite intent to kill for second degree murder.

The acquittal on the principal firearm use allegation does not mean the jury necessarily found defendant did not know Arzate was armed and did not aid and abet the murder. The transcript of the resentencing hearing shows the court expressly considered the defense argument that the jury's not true finding on the principal firearm use allegation supported an implied finding the jury found defendant was not an aider and abettor with knowledge that Arzate was armed. The court was not persuaded that was a reasonable inference. The court explained, "But there was no specific finding and the court's not prepared to accept that there was some type of implied finding that he was not an aider and abettor."

12

The court recited at length the facts in support of its conclusion that defendant could be convicted of second degree murder as an aider and abettor under current law.

"THE COURT:  [¶]  . . .  [¶]  [Defendant] makes a left onto Washington, and this is the part that I really find probative in the case, he slows down, he takes the car and he backs the car into the alley ready for an escape.

"He doesn't park on the side. . . .  [I]f this was a drive-by shooting, that would be a different argument, then we would have the perpetrator doing something sudden without the knowledge of the driver and there is a good argument could [*sic*] be made that the driver did not know what was happening, but the problem is [defendant] drives past the house, stops and backs the car into the alley.  He's ready to make an escape.

"And inside the car we have Arzate is [*sic*] in the passenger seat, G.E. in the back seat.  G.E. sees Arzate fumble with the gun or get the gun from the middle of the seat, sounds like a console.

"Now, if G.E. sees that gun from the back, almost certainly [defendant] sees the gun, he's right next to him.

"Also, what else do we know about the gun?  We know that Arzate had the gun the night before.  How do we know that?  G.E. said Arzate had the gun in the presence of [defendant] the night before.

"So we know that [defendant] knew Arzate had the gun. We know that [defendant] knew or it's [*sic*] strong evidence that he sees the gun in [Arzate's] hand before he alights [from] the vehicle.  Arzate gets out of the car with the gun at his side.  What does [defendant] think Arzate is gonna do when he stops the car? What is he gonna do?  It seems to me there is only one thing a

13

fellow gangster is gonna do when he confronts another gangster, and, that is, he's gonna shoot him.

"Now, one can argue, well, maybe he was gonna go over there and engage in a fist fight.

"We have the expert testimony from the gang expert that says that gun fights are much more common than fist fights. And, also, don't forget, that we know that there are two gangsters—I shouldn't say gangsters—there is [*sic*] two gang-affiliated people in the house.

"So [Arzate] is gonna walk to this house by himself and engage in a fist fight with two gang-affiliated guys? No. That's not gonna happen. So . . . what is [defendant] thinking when he pulls the car, gets in a position to escape and then [Arzate] gets out of the car? I think that's strong, strong evidence that [defendant] knew and was in on it of what was gonna happen.

"So what does Arzate do? He gets out. Where is the gun? Is it in his waistband? No. The gun is at his side and he's walking, he's walking to the victim who happens to be—Arzate is about 30 feet away from the car. [Defendant], he's right there, and they engage. G.E. says they bang at each other, so they're talking gang stuff back and forth, and then Arzate shoots him dead.

"He runs back—he runs back into the car, [defendant] says 'Where's he from' he says, 'VNE' and then drives off, drives off, and the gun is later found in the car, and when he stops, he flashes his gang sign reinforcing the notion that these are gangsters engaging in gang conduct.

"The other factor is they've got a young guy in the back and they're showing him the rough. He was jumped in the night before.

"So when Arzate got back into the car he says, 'I got him.'

"[Defendant's] comments to G.E. about, 'Don't worry about it, be calm, be cool,' seems to me that those are comments by a senior or veteran gang member telling the rookie just—just to hang tight, be cool, just—just—just stay there.  So I think that with the evidence as I have recited it that there is sufficient evidence to convict [defendant] of second degree murder as an aider and abettor beyond a reasonable doubt."

Defendant contends the court prejudicially erred by finding defendant knew Arzate was armed despite the jury's not true finding on the principal firearm use allegation.  Defendant cites *Cooper* and *Henley*.  In both those cases, the Courts of Appeal reversed the denial of resentencing petitions where the trial courts denied resentencing on the ground the *defendants themselves were personally armed and used a firearm*, despite contrary and inconsistent jury findings the defendants did not use firearms.

The trial court here did not find *defendant* was armed or used a firearm, but that defendant knew Arzate was armed and planned to use a firearm.  That was one of many other facts the court found supported its conclusion that defendant aided and abetted the murder.  The jury's not true finding on the principal firearm use allegation is not contrary to or inconsistent with the court's finding that defendant directly aided and abetted the murder.  The court here did *not* turn an acquittal or not true finding " 'into [its] opposite.' "  (*Cooper*, *supra*, 77 Cal.App.5th at p. 417.)

"[U]nder direct aiding and abetting principles, an accomplice is guilty of an offense perpetrated by another if the accomplice aids the commission of that offense with 'knowledge of

the direct perpetrator's unlawful intent and [with] an intent to assist in achieving those unlawful ends.' " (*People v. Gentile* (2020) 10 Cal.5th 830, 843.) The jury's not true finding as to the principal firearm use allegation has no bearing on defendant's guilt as a direct aider and abettor. A defendant's presence at the crime scene, companionship and conduct with the perpetrator before and after the murder, and motive are all relevant factors in determining aiding and abetting liability. (*People v. Schell*, *supra*, 84 Cal.App.5th at p. 443.)

The evidence discussed above establishes all of these factors. Defendant had a gang motive; he participated in gang activities with the shooter the day before the murder, including jumping 14-year-old G.E. into the gang; defendant drove Arzate and the newly minted gangster G.E. to the victim's home, surveilled the scene as G.E. threw gang signs, and parked in an alleyway that both gave full view of the shooting and blocked any other car from interfering with the getaway; defendant waited for Arzate in his car until after the shooting of a man they believed to be a rival gang member; defendant drove the getaway car; and he concealed the murder weapon in a door panel of his car. Under the law, defendant is guilty of second degree murder as an aider and abettor.

### 3. Ineffective Assistance of Counsel

Our Supreme Court recently reaffirmed " 'there is no constitutional right to the effective assistance of counsel' in state postconviction proceedings." (*People v. Delgadillo* (2022) 14 Cal.5th 216, 226; see also *People v. Lewis* (2021) 11 Cal.5th 952, 972 ["There is no unconditional state or federal constitutional right to counsel to pursue collateral relief from a judgment of conviction."].)

16

However, in *Wilson v. Superior Court of Los Angeles County* (1978) 21 Cal.3d 816, 823, the Supreme Court concluded that once a substantial state created right has been conferred, due process protects the effective exercise of that right to ensure that the right " ' "is not arbitrarily abrogated." ' "  Several courts have followed *Wilson* and concluded that a right to counsel conferred by statute is protected by due process and implicitly includes the right to effective assistance.  (See, e.g., *People v. Hill* (2013) 219 Cal.App.4th 646, 652–653 ["although the right to effective assistance of counsel in SVPA proceedings is statutory, that right is protected by the due process clause of the federal Constitution"] & *Conservatorship of David L.* (2008) 164 Cal.App.4th 701, 710 [even if a proposed conservatee has no constitutional right to effective assistance of counsel, once such a right has been conferred by statute, it is protected by the due process clause of the federal Constitution].)

Penal Code section 1172.6 expressly grants a petitioner seeking postconviction resentencing the right to appointment of counsel upon request.  (*Id.,* subd. (b)(3) ["if the petitioner has requested counsel, the court shall appoint counsel to represent the petitioner"].)  However, we need not decide whether that statutory right to counsel includes the right of a petitioner to raise an ineffective assistance claim.  Even assuming defendant's ineffective assistance claim is cognizable, it lacks merit.

Defendant asserts the standard articulated in *Strickland v. Washington* (1984) 466 U.S. 668 (*Strickland*) for assessing the competency of counsel in criminal trial proceedings would be the appropriate standard for resolving his claim.  Accepting that as true for purposes of our discussion, the *Strickland* standard has two elements.  A defendant must show *both* that "counsel failed

17

to act in a manner to be expected of reasonably competent attorneys acting as diligent advocates, and that it is reasonably probable a more favorable determination would have resulted in the absence of counsel's failings." (*People v. Cudjo* (1993) 6 Cal.4th 585, 623, citing *Strickland,* at pp. 687–696.)

Defendant's claim is based on counsel's alleged failure to present new evidence at the hearing and his alleged misunderstanding of the scope of the hearing. The transcript of the hearing shows that counsel told the court he had no intent to introduce new evidence because he believed it could create "huge" problems and was inconsistent with the statutory purpose. Counsel focused instead on strenuously arguing that the existing evidentiary record was insufficient to establish any theory of defendant's guilt other than the now-invalid natural and probable consequence theory, and that defendant was therefore entitled to relief.

*Strickland* cautions that "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " (*Strickland, supra,* 466 U.S. at p. 689.)

Defendant has not shown that defense counsel's chosen strategy was unsound or otherwise fell outside the range of reasonable professional assistance. Defendant also has not

established the likelihood of a more favorable outcome had counsel offered additional evidence at the hearing related to Arzate's alleged personal motive for the shooting—evidence of which the court was already aware from having heard and resolved defendant's motion for new trial.

## DISPOSITION

The order denying Anthony Michael Delci's petition for resentencing is affirmed.


GRIMES, J.


WE CONCUR:


STRATTON, P. J.


WILEY, J.